## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

| | |
|---|---|
| **PREMIER ENTERTAINMENT BILOXI LLC (D/B/A HARD ROCK HOTEL & CASINO BILOXI) AND PREMIER FINANCE BILOXI  CORP.,** | **CASE NO. 06-50975-NPO** |
| **DEBTORS.** | **CHAPTER 11 JOINTLY ADMINISTERED** |
| **PREMIER ENTERTAINMENT BILOXI LLC (D/B/A HARD ROCK HOTEL & CASINO BILOXI) AND PREMIER FINANCE BILOXI CORP.** | **PLAINTIFFS AND COUNTER-DEFENDANTS** |
| **VS.** | **ADV. PRO. NO. 07-05043-NPO** |
| **U.S. BANK NATIONAL ASSOCIATION, PACIFIC INVESTMENT MANAGEMENT COMPANY, LLC, DEUTSCHE ASSET MANAGEMENT, AND CASTLERIGG MASTER INVESTMENTS LTD.** | **DEFENDANTS AND COUNTER-PLAINTIFFS** |

### MEMORANDUM OPINION ON COMPLAINT FOR DECLARATORY JUDGMENT WITH RESPECT TO DISPUTED LIQUIDATED DAMAGES CLAIMS AND RELATED OBJECTIONS TO PROOFS OF CLAIM  NOS. 101, 102, 103, 104, 108 AND 115 FILED BY U.S. BANK NATIONAL ASSOCIATION PURSUANT TO BANKRUPTCY RULE 3007 AND COUNTERCLAIMS

There came on for trial on March 16-19, 2010 (the "Adversary Trial"), in the above-styled

adversary proceeding (the "Adversary"), the Complaint for Declaratory Judgment with Respect to

Disputed Liquidated Damages Claims and Related Objections to Proofs of Claim Nos. 101, 102,

103, 104, 108 and 115 filed by U.S. Bank National Association Pursuant to Bankruptcy Rule 3007

(the "Complaint") (Adv. Pro. Dkt. 1)[1] filed by Premier Entertainment Biloxi LLC (d/b/a Hard Rock Hotel & Casino Biloxi) ("PEB") and Premier Finance Biloxi Corp. ("Premier Finance," together with PEB, collectively referred to as the "Debtors"); the Amended Answer and Counterclaims (the "Amended Answer") (Adv. Pro. Dkt. 51) filed jointly by Defendant/Counter-Plaintiff U.S. Bank National Association, as Indenture Trustee ("U.S. Bank" or the "Indenture Trustee"), and Defendants/Counter-Plaintiffs Pacific Investment Management Company, LLC ("PIMCO"), Deutsche Asset Management ("Deutsche"), and Castlerigg Master Investments Ltd. ("Castlerigg") (together, the "Noteholders" and collectively with the Indenture Trustee, the "Claimants"); and the Answer to Amended Counterclaim (Adv. Pro. Dkt. 52) filed by the Debtors. The Claimants seek payment to the Indenture Trustee, for distribution to the Noteholders, of up to $13.7 million. The Noteholders' right to payment, if any, is based upon claims arising under a Trust Indenture dated January 23, 2004 (the "Indenture").

At the Adversary Trial, Robert Alan Byrd represented the Debtors; Richard G. Wilson and Henry E. Chatham, Jr. represented U.S. Bank; and Sidney P. Levinson, Thomas B. Watson, and Richard A. Montague, Jr. represented the Noteholders. At the conclusion of the four-day trial, the

---

[1]  Citations to the record are as follows: (1) citations to docket entries in this Adversary, Case No. 07-05043-NPO, are cited as "(Adv. Pro. Dkt. ____)"; (2) citations to docket entries in the main bankruptcy case, Case No. 06-50975-NPO, are cited as "(Bankr. Dkt. ____)"; (3) citations to docket entries in the stay proceedings, Case No. 1:07-MC-01005-LTS in the United States District Court for the Southern District of Mississippi are cited as "(Stay Dkt. ___)"; (4) citations to docket entries in the appellate proceedings before the United States District Court for the Southern District of Mississippi, Case No. 1:07-CV-01058-LG-RHW, are cited as "(D.C. App. Dkt. ____)." Exhibits from the Adversary Trial are cited as "Trial Ex.____." Page numbers for the Adversary Trial exhibits refer either to the original page number of the document itself or, for those exhibits where page numbers are included, to that page number (so that the page citation reads "____of ____"). The transcript of the Adversary Trial is cited as "Trial Tr. at ____".

Court directed the parties to file simultaneously post-trial briefs on all relevant issues, including, without limitation, the issue as to whether the Indenture is properly classified as an executory contract and if so, the potential implications on the claims asserted in this Adversary.[2]  On May 5, 2010, the Debtors filed the Reorganized Debtors' Post-Trial Brief (the "Debtors' Post-Trial Brief") (Adv. Pro. Dkt. 92).  Likewise on May 5, 2010, the Claimants filed the Post-Trial Brief of U.S. Bank National Association, Pacific Investment Management Company, LLC, Deutsche Asset Management, and Castlerigg Master Investments Ltd. (the "Claimants' Post-Trial Brief") (Adv. Pro. Dkt. 91).

The Claimants on May 17, 2010, filed a Request of U.S. Bank National Association, Pacific Investment Management Company, LLC, Deutsche Asset Management and Castlerigg Master Investments Ltd. for Leave to File a Rebuttal Brief (Adv. Pro. Dkt. 93).  In response, the Debtors filed on May 20, 2010, the Reorganized Debtors' Opposition to Defendants' Joint Request for Leave to File a Rebuttal Brief (Adv. Pro. Dkt. 95).  After a hearing held on June 3, 2010, the Court granted the Claimants leave to file on or before June 17, 2010, a rebuttal brief and granted the Debtors leave to file a response on or before July 1, 2010.  (Adv. Pro. Dkt. 98).  On June 17, 2010, the Claimants filed the Supplemental Brief of U.S. Bank National Association, Pacific Investment Management Company, LLC, Deutsche Asset Management, and Castlerigg Master Investments Ltd. (the "Claimants' Supplemental Post-Trial Brief") (Adv. Pro. Dkt. 100).  On July 1, 2010, the Debtors filed the Reorganized Debtors' Response to Defendants' Supplemental Brief (the "Debtors' Supplemental Post-Trial Brief") (Adv. Pro. Dkt. 101).

---

[2] Trial Tr. at 65:7-67:5.

The Court[3] has considered the pleadings, evidence, arguments of counsel, briefs, and the law and finds that the Noteholders are entitled to an allowed unsecured claim in the amount of $9,574,123, plus interest at the federal judgment rate in effect on August 10, 2007, from that date until paid for the following reasons:

### Introductory Statement and Overview

The length of this opinion warrants a brief overview of its structure. The testimony and evidence presented at the Adversary Trial covered events beginning in 2002, when the Debtors started planning the construction of a casino along the Mississippi Gulf Coast, and ending in 2007, when the Debtors substantially consummated their plan of reorganization under chapter 11 of the Bankruptcy Code.[4] During these five years, the parties entered into a complicated financing transaction, endured a hurricane of historic proportions, engaged in litigation in state and federal courts, survived numerous tender offers, commenced bankruptcy cases under chapter 11, and pursued appeals to the United States District Court and the United States Court of Appeals for the Fifth Circuit. These events are arranged in chronological order in the facts section and are recited in some detail to provide a clear understanding of this Court's determination of the issues involved.

The discussion section of the opinion is divided into four major subsections. Subsection A sets forth the appropriate burden of proof. Subsection B examines whether the Indenture is an executory contract. That issue is discussed early because of its potential impact on the enforceability

---

[3] Originally, this case was assigned to the Honorable Edward R. Gaines, United States Bankruptcy Judge. The case was reassigned to the undersigned judge on February 10, 2009, when Judge Gaines became ill.

[4] "Bankruptcy Code" refers to the United States Bankruptcy Code located at Title 11 of the United States Code. All code sections hereinafter will refer to the Bankruptcy Code unless specifically noted otherwise.

of the prepayment provisions in the Indenture.  Subsections C and D focus upon the crux of the parties' dispute: Subsection C examines whether the prepayment provisions grant the Claimants the right to payment of an allowed secured claim under § 506(b) of the Bankruptcy Code; and subsection D explores the alternative argument raised by the Claimants—whether they have a right to payment of an allowed unsecured claim under § 502(b).  Subsection D also discusses the amount of damages and interest to which the Claimants are entitled.

## Jurisdiction

This Court has jurisdiction over the subject matter of and the parties to this proceeding.  This matter is a core proceeding as defined in 28 U.S.C. § 157(b)(2).  Notice of the Adversary Trial was proper under the circumstances.

## Facts[5]

### Hard Rock Hotel & Casino Biloxi

The Debtors were formed in 2002 for the purpose of constructing the Hard Rock Hotel & Casino Biloxi (the "Resort"), a full-service gaming and entertainment resort, along 8.5 acres of shoreline property in Biloxi, Mississippi. The Debtors signed a license agreement with Hard Rock Hotel Licensing, Inc. ("Hard Rock"), under which the Debtors obtained the exclusive right to design the Resort using Hard Rock's brand name.[6]

---

[5]  Pursuant to Fed. R. Civ. P. 52, as made applicable by Federal Rule of Bankruptcy Procedure 7052, the following constitutes the findings of fact and conclusions of law of the Court.

[6]  The initial term of the license agreement was 20 years with two,10-year renewal options. Trial Ex. 101, at 20-21 of 175.

The exterior design of the Resort featured a 112-foot guitar sign. The interior design of the Resort, encompassing 388,000 square feet, featured (1) a 50,000 square-foot casino with 1,500 slot machines and 50 table games, modeled after the Hard Rock Hotel & Casino Las Vegas; (2) an eleven-story hotel; (3) four restaurants; (4) a 20,000 square-foot concert/multi-purpose venue with capacity for more than 1,000 people; (5) a tropical-themed swimming pool; (6) a 7,800 square-foot fitness spa and salon; (7) a retail store; and (8) a 1,600-space parking garage. In accordance with Mississippi law, the casino areas of the Resort were designed to be built on barges moored to the shore and connected to the land-based portion of the Resort.[7]

The Debtors sought to raise capital to finance the design, construction, furnishing, and operation of the Resort through an offering of notes.[8] To do so, the Debtors and their investment bankers drafted the Indenture that is the centerpiece of this Adversary.[9]

**The Indenture**

Pursuant to the Indenture, the Debtors issued 10.75% first mortgage notes (the "Notes")[10] and designated U.S. Bank as the Indenture Trustee. The original aggregate principal amount of the Notes was $160 million. A Pledge and Security Agreement granted the Noteholders a security interest in substantially all of the Debtors' real and personal property, other than certain equipment

---

[7] Enacted in 1990, the Mississippi Gaming Control Act legalized dockside gaming at the discretion of those counties that bordered either the Mississippi River or the Gulf Coast, the effect of which was to restrict casino operations to river boats or barges. Miss. Code Ann. § 97-33-1.

[8] Trial Exs. 1 & 101.

[9] Indenture, Trial Ex. 1; Test. of Joseph Billhimer, Trial Tr. at 791:17-22.

[10] The Indenture uses the term "Notes" to describe the debt securities. For the sake of consistency, this Court will use that term, as opposed to the term "Bonds."

that was financed separately.[11]  The Notes provided for interest payments of $8.6 million, due on February 1 and August 1 of each year beginning on August 1, 2004.[12]  Payment of $160 million in principal was due at maturity on February 1, 2012.[13]

### 1. Insurance: § 4.22

Section 4.22(a)(1) of the Indenture required the Debtors, until the Notes had been paid in full, to "keep its properties . . . adequately insured at all times by financially sound and reputable insurers."[14]  In addition, § 4.22(a)(2) required the Debtors to maintain and pay for property and casualty insurance, business interruption insurance, and comprehensive general liability insurance to protect and insure against losses or damages caused by a hurricane, among other risks and hazards.[15] The Indenture further required that all such insurance policies name the Indenture Trustee as an additional insured or loss payee.[16]  The Indenture did not specify the amount of coverage but required coverage "in such amounts as is customarily carried by similar businesses with such deductibles, retentions, exclusions, self insured amounts and coinsurance provisions as are customarily carried by similar businesses of similar size operating in the same or similar locations . . . ."[17]

---

[11]  Trial Ex. 3.

[12]  Indenture, Trial Ex. 1.

[13]  Indenture, Trial Ex. 1; see Test. of David Behenna, Trial Tr. at 72:20-73:5.

[14]  Indenture § 4.22(a), Trial Ex. 1.

[15]  Id.

[16]  Indenture § 4.22(c), Trial Ex. 1.

[17]  Indenture § 4.22(a), Trial Ex. 1.

## 2. No-Call Provision: § 3.07(a)

To protect the Noteholders against the risk that the Debtors might refinance the Notes prior to their stated maturity date if interest rates declined, § 3.07(a) provided that, with one exception involving initial public offerings that is not relevant to this Adversary, "the Notes will not be redeemable at the Issuers' option prior to February 1, 2008"[18] (the "No-Call Provision"). Such provisions are common in the financial market; otherwise, an incentive exists for a borrower to repay a fixed-rate loan as soon as the benefit of refinancing exceeds the transaction costs of procuring a new loan, thereby depriving the original lender of its expected interest income.[19]

The four-year period under which the Debtors were prohibited from redeeming the Notes (the "No-Call Period") covered the first half of the eight-year term of the Notes.[20] The relative length of the No-Call Period was "in the range" when compared to similar transactions in the market.[21]

## 3. Optional Redemption: § 3.07(b)

The Indenture allowed the Debtors, at their option, to redeem the Notes prior to their maturity date but not during the No-Call Period. The Debtors, however, had to pay a premium[22] for the privilege, depending on when the Debtors exercised that option. Section 3.07(b) provided:

---

[18] Indenture § 3.07(a)(2) at 54 of 113, Trial Ex. 1.

[19] Test. of Christopher Kearns, Trial Tr. at 218:7-12; Test. of Joseph Billhimer, Trial Tr. at 793:9-10.

[20] Test. of David Behenna, Trial Tr. at 78:2-4.

[21] Test. of David Behenna, Trial Tr. at 78:5-8.

[22] The Claimants in the Claimants' Post-Trial Brief refer to the premium as "yield protection," but the Debtors in the Debtors' Post-Trial Brief refer to it as a "penalty." This Court uses the term "premium" because that is the term used in the Indenture.

On or after February 1, 2008, the [Debtors] may redeem all or part of the Notes . . . at the redemption prices (expressed as percentages of principal amount) set forth below plus accrued and unpaid interest and Liquidated Damages, if any, on the Notes redeemed:

| Year | Percentage |
|------|-----------|
| 2008.................................... | 105.375% |
| 2009.................................... | 102.688% |
| 2010 and thereafter............. | 100.000% |

The optional redemption price decreased each year in patterned steps until it reached zero two years before the maturity date in 2012. Thus, during those last two years, the Debtors could repay the principal amount of the notes in favorable market conditions without incurring any extra expense.

### 4. Acceleration of Maturity: § 6.02

Section 6.02 of the Indenture described two events of default that warranted immediate acceleration of the maturity date of the Notes "without further action or notice." These events of default were: (1) the commencement by the Debtors of a voluntary case under the Bankruptcy Code[23] and (2) the failure of the Resort to open by December 31, 2005.[24] In case of any other event of default, the Indenture allowed the Indenture Trustee and a specified percentage of the Noteholders the *option* of declaring all the Notes "due and payable immediately."

---

[23] Indenture § 6.01(j), Trial Ex. 1.

[24] Indenture § 6.01(o), Trial Ex. 1. Section 6.01, which listed a total of seventeen events of default, did not state whether events resulting from *force majeure* were intended to be treated as defaults. In general, a *force majeure* clause under New York law excuses a party from performing its obligations if the failure is caused by a condition outside its control, such as a performance failure caused by a natural disaster. See Kel Kim Corp. v. Cent. Mkts., Inc., 519 N.E.2d 295, 296 (N.Y. Ct. App. 1987). The defense, however, applies "only if the *force majeure* clause specifically includes the event that actually prevents a party's performance." Id.; see also Indenture § 14.09, Trial Ex. 1 (New York law governs Indenture.).

Under certain enumerated conditions, the acceleration of the Notes entitled the Noteholders to collect an additional premium from the Debtors:

> If an Event of Default occurs prior to February 1, 2008 by reason of any willful action (or inaction) taken (or not taken) by or on behalf of the Issuers [i.e., the Debtors] with
> the intention of avoiding the prohibition on redemption of the Notes prior to such date, then, upon acceleration of the Notes, an additional premium shall also become due and be immediately due and payable in an amount, for each of the years beginning on February 1 of the years set forth below, as set forth below (expressed as a percentage of the principal amount of the Notes on the date of payment that would otherwise be due but for the provisions of this sentence):[25]

| Year | Percentage |
|------|------------|
| 2004 | 110.75000% |
| 2005 | 109.40625% |
| 2006 | 108.06250% |
| 2007 | 106.71875% |

Accordingly, under this provision of § 6.02, if the Debtors willfully caused the Notes to accelerate with the intention of avoiding the No-Call Provision during the period from February 1, 2006, to January 31, 2007, the Debtors were required to pay the Noteholders 108.0625% of the principal amount, or an additional premium of $12.9 million.[26] If such an acceleration of the Notes occurred during the period from February 1, 2007 to January 31, 2008, the Debtors were required to pay the Noteholders 106.71875% of the principal amount, or an additional premium of $10.75 million.[27] The amount of the additional premium declined each year until it reached zero on February 1, 2010,

---

[25] Indenture § 6.02, 74 of 113, Trial Ex. 1.

[26] It was within this time period, on September 19, 2006, that the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code. See infra p. 38.

[27] It was within this time period, on August 10, 2007, that the Debtors repaid the Notes under their chapter 11 plan of reorganization. See infra pp. 49-50.

two years before the maturity of the Notes.[28]  A majority of the Noteholders, on behalf of all the Noteholders, could rescind an acceleration or waive any existing event of default and its consequences by providing written notice to the Indenture Trustee.

### 5. Defeasance: § 12.01

The Indenture contained a defeasance clause that allowed the Debtors, *at their option*, to repay the Notes prior to the end of the No-Call Period under certain conditions.  More specifically, if the Debtors desired to obtain the release of their collateral without the consent of the Noteholders, then §12.01 of the Indenture, entitled "Satisfaction and Discharge," enabled them to do so by arranging for payment of the Notes from an alternative source—noncallable government securities "in such amounts as will be sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Notes not delivered to the Trustee for cancellation for principal, premium and Liquidated Damages, if any, and accrued interest to the date of maturity or redemption."[29]  The Debtors thus had the option of purchasing government securities with maturities matching the dates on which payments under the Indenture became due, so that they could pay off the Notes by depositing the present value of the difference between the contract rate of interest under the Indenture (10.75%) and the prevailing rate for Treasury obligations with comparable maturities. In effect, the defeasance provision operated much like a "make-whole" provision,[30] intending to compensate the Noteholders for their loss of future interest payments by requiring the Debtors to

---

[28]  See Trial Ex. 179 (chart showing decline from 2004 through 2010 in the amount of premium payable upon a willful event of default).

[29]  Indenture § 12.01, Trial Ex. 1.

[30]  Test. of David Behenna, Trial Tr. at 142:24-143:21,188:11-189:6.

pay some variation of present value of the scheduled interest payments remaining during the No-Call Period.   This defeasance provision was available to the Debtors only if no event of default had occurred that continued to the date of repayment.

### 6.  The Construction Disbursement Account: § 4.17

The Indenture required Premier Finance to deposit most of the proceeds from the Notes, $143.5 million, into a Construction Disbursement Account.[31]  Those funds could then be disbursed to the Debtors only in accordance with the parties' Cash Collateral and Disbursement Agreement (the "Disbursement Agreement").[32]

**The Disbursement Agreement**

The Debtors entered into a Disbursement Agreement on the same date as the Indenture.[33] U.S. Bank served as the Disbursement Agent under the Disbursement Agreement as well as the Indenture Trustee under the Indenture.[34]

The Disbursement Agreement established conditions for the funding of construction costs and procedures for approving change orders and amendments to the construction budget and schedule.  Generally, the Disbursement Agreement authorized the Disbursement Agent to disburse funds to the Debtors to pay construction costs only if there were sufficient available funds in the Construction Disbursement Account to complete the Resort by December 31, 2005, within the

---

[31]  Indenture § 4.17, Trial Ex. 1.

[32]  Disbursement Agreement, Trial Ex. 2.

[33]  Id.

[34]  To avoid confusion, the dual roles of U.S. Bank are at times discussed as if they were held by separate entities.

limitations set by the budget. To facilitate enforcement of these key provisions, any disbursement of the proceeds of the Notes required the Debtors to submit to the Disbursement Agent a Construction Disbursement Request, a form attached as Exhibit C-1 to the Disbursement Agreement, that included the following representations and certifications by the Debtors:

> (g)    [The Resort] Budget accurately sets forth the anticipated Construction Expenses through completion of construction of the Resort in the aggregate and for each line item. . . .

> (h)    The [Resort] Budget continues to accurately set forth all anticipated Pre-Opening Expenses through the Initial Operating Date in all material respects.

> (i)    After giving effect to the required disbursements from the Construction Disbursement Account, there are sufficient Available Construction Funds to pay for the anticipated costs described in Paragraphs (g) and (h) above, and any other material expenses the Issuer reasonably believes will need to be incurred by the Issuer in order to cause the Initial Operating Date to occur on or prior to [December 31, 2005].

> . . .

> (n)    The Issuer reasonably believes that the Initial Operating Date will occur on or prior to [December 31, 2005].[35]

The term "Available Construction Funds" used in paragraph (i) was defined under the Disbursement Agreement to mean:

> [T]he sum of (a) the Original Construction Allocation, (b) any additional equity, Loss Proceeds or other additional amounts then on deposit in the Construction Disbursement Account (excluding the Original Construction Allocation) and (c) all Additional Pre-Operating Revenue as of such time, all less the sum of (x) the proceeds of FF&E Financing that the Issuer has theretofore expended in connection with the [Resort] and (y) the amount of disbursements theretofore made from the Construction Disbursement Account.[36]

These provisions were designed to ensure that there were, on deposit at the time of any

---

[35] Disbursement Agreement, Form C-1, Trial Ex. 2.

[36] Disbursement Agreement § 1.1, Trial Ex. 2.

disbursement, sufficient funds to complete the Resort pursuant to the budget and schedule agreed to by the parties.[37]   As additional protection, the Disbursement Agreement required that an independent construction consultant retained by the Disbursement Agent certify and confirm the accuracy of the Debtors' representations and certifications.[38]

### The Noteholders

The Noteholders purchased the Notes from the Debtors, and thereafter on the financial trading market.  Among the entities that either purchased the Notes, or managed funds that purchased the Notes, were PIMCO, Deutsche, and Castlerigg.[39]

### Construction of the Resort

Using the proceeds from the Notes, the Debtors began construction of the Resort.[40]  Full service casino and hotel operations were scheduled to commence at midnight on August 31, 2005,[41] well before the operations deadline of December 31, 2005.

### Insurance Coverage for the 2005-2006 Hurricane Season

During the period of time that construction was underway, the Debtors obtained insurance policies for all risks with an aggregate policy limit per occurrence of approximately $88 million.[42] In contemplation of completed construction and operation of the Resort, the Debtors on August 15,

---

[37]  Disbursement Agreement 46 of 231, Trial Ex. 2.

[38]  Disbursement Agreement 97-98 of 231, Trial Ex. 2.

[39]  Western Asset Management is no longer a party in the Adversary.

[40]  See Test. of Joseph Billhimer, Cash Collateral Hr'g (Oct. 3, 2006), Trial Ex. 29, at H'rg Tr. 34:39.

[41]  See id. at 34:14–18.

[42]  Trial Ex. 125, ¶ 15 at 5 of 38.

2005, replaced these policies with 14 separate property and casualty insurance policies having an aggregate policy limit per occurrence of approximately $181.1 million (the "Insurance Policies").[43] This coverage cost the Debtors between $800,000 and $900,000.[44]

### First Completion of the Resort

The Debtors completed the construction of the Resort, including the casino barges and the 112-foot guitar sign, on time and on budget and received a temporary certificate of occupancy on August 26, 2005.[45]  On that same date, Ruth's Chris Steak House, a fine dining restaurant at the Resort, and the Hard Rock Café began serving meals.

### Destruction of the Resort by Hurricane Katrina

On August 29, 2005, just a few days before the Resort's scheduled grand opening, Hurricane Katrina, one of the worst natural disasters ever to strike the continental United States, devastated much of the central Gulf Coast of the United States.[46]  Hurricane Katrina completely destroyed the Resort's casino, situated on two floating barges, and severely damaged its related facilities, including the hotel and parking garage.[47]

In the aftermath of Hurricane Katrina, the Debtors planned to reconstruct the Resort.  To do

---

[43]  See Test. of Joseph Billhimer, Cash Collateral Hr'g (Oct. 3, 2006), Trial Ex. 29, at H'rg Tr. 50:6–13; Trial Ex. 125, ¶ 15, at 5 of 38.

[44]  Trial Ex. 71.

[45]  See Test. of Joseph Billhimer, Cash Collateral Hr'g (Oct. 3, 2006), Trial Ex. 29 at H'rg Tr. at 33:16-35:20; Test. of Todd Raziano, Trial Tr. at 437:19-21.

[46]  Test. of Joseph Billhimer, Cash Collateral Hr'g (Oct. 3, 2006), Trial Ex. 29 at H'rg Tr. at 36:15–16.

[47]  See id. at 37:11–38:1.  Interestingly, the 112-foot guitar sign survived the storm.  See Property Photographs of Katrina Damage, Trial Ex. 50.

so, however, required substantial changes to the original plans.  In particular, the casino would no longer be built on two floating barges.  Instead, the new permanent casino would be built in the same location but on concrete piers.[48]  The cost to reconstruct the Resort was far more than the amount of cash that remained in the Available Construction Funds because by that time, the Disbursement Agent had disbursed almost all of the proceeds from the Notes to the Debtors as the first construction of the Resort had neared completion.

**Collection of Insurance Proceeds**

The Insurance Policies, bound just two weeks before Hurricane Katrina struck, proved providential.  The Debtors, together with the Indenture Trustee, pursued recovery of the insurance proceeds in the full amount of the $181 million limit (the "Insurance Proceeds").[49] Because the Noteholders had a valid and enforceable lien on all the Insurance Proceeds, the Debtors delivered the funds upon receipt to U.S. Bank, which held them in its separate capacities as both the Indenture Trustee and the Disbursement Agent.

The process of collecting Insurance Proceeds took time; by the end of 2005, the Debtors had collected only about $25 million.[50]  That amount increased to about $50 million by the end of March

---

[48]  Test. of Joseph Billhimer, Trial Tr. at 783:14-784:7.  In the wake of Hurricane Katrina, the Mississippi Gaming Control Act was amended to allow casino operations to be built on land as long as they were built within 800 feet of the waterfront.  Miss. Code Ann. § 97-33-1 (amended Oct. 17, 2005).

[49]  Test. of Joseph Billhimer, Cash Collateral Hr'g (Oct. 3, 2006), Trial Ex. 29 at H'rg Tr. at 51:1–18.

[50]  Trial Ex. 87.

2006.[51]  By the summer of 2006, the Debtors had settled most of their insurance claims.[52]  By August 31, 2006, the Debtors had collected about $160 million in Insurance Proceeds, which the Disbursement Agent held in separate, restricted accounts,[53] rather than in the Construction Disbursement Account, over the Debtors' objections.  At that time, the Debtors still had an outstanding insurance claim against James River Insurance Co. which was ultimately settled for $11 million.[54]

The amount of the Insurance Proceeds, together with the pre-Hurricane Katrina funds remaining in the Construction Disbursement Account (as defined in the Disbursement Agreement) and the equipment financing permitted under the Indenture, were sufficient to allow the Debtors to rebuild the Resort, commence operations, and satisfy all of the Debtors' trade debt, including all the debt that arose prior to Hurricane Katrina.[55]

### The Debtors' Negotiations with the Indenture Trustee/Disbursement Agent to Rebuild the Resort Using the Insurance Proceeds

The Debtors began negotiations with the Indenture Trustee/Disbursement Agent for use of the Insurance Proceeds in order to begin full-scale rebuilding of the Resort and to pay the trade

---

[51]  Id.

[52]  Test. of David Behenna, Trial Tr. at 91:5-16; Test of Todd Raziano, Trial Tr. at 434:11-23; Trial Ex. 87.

[53]  Trial Ex. 87; see Test. of Todd Raziano, Cash Collateral Hr'g (Oct. 4, 2006), Trial Ex. 124, at H'rg Tr. 34:3–9; Test. of Joseph Billhimer, Cash Collateral Hr'g (Oct. 3, 2006), Trial Ex. 29, at H'rg Tr. 207:5, 210:20–21.

[54]  Trial Ex. 150, at 4 of 28.  The settlement was the result of litigation initiated by the Debtors against James River Insurance Co. in Mississippi.

[55]  See Test. of Joseph Billhimer, Cash Collateral Hr'g, (Oct. 3, 2006), Trial Ex. 29, at Hr'g Tr. at 79:2–5.

vendors and subcontractors who had rendered services prior to Hurricane Katrina,[56] but their efforts were largely unsuccessful. For payment of post-Hurricane Katrina remediation work performed to protect and stabilize the Resort, the Debtors requested on October 3, 2005, disbursement of $5 million of the Insurance Proceeds, pursuant to § 4.2.3(b) of the Disbursement Agreement. On October 7, 2005, the Disbursement Agent denied the request on the ground that the Insurance Proceeds were subject to the lien of the Noteholders.[57]  Then, on October 17, 2005, the Debtors requested that $1.2 million of Insurance Proceeds be transferred into the Construction Disbursement Account.  The Disbursement Agent denied this request but allowed the Debtors access to $1.2 million of funds that remained in the Construction Disbursement Account for payment of the remediation work on the Resort.[58]

For payment of pre-Hurricane Katrina constructions expenses, the Debtors submitted on or about October 12, 2005, Construction Disbursement Request No. 19 to the Disbursement Agent pursuant to § 4.2.2 of the Disbursement Agreement. On or about October 19, 2005, the Disbursement Agent denied the request based on the Noteholders' objection to the Debtors' use of *any* proceeds, whether loan proceeds or Insurance Proceeds, to pay unsecured claims that arose prior to Hurricane Katrina.

The Indenture Trustee and the Disbursement Agent in general embraced the position of the

---

[56]  Some of the Debtors' trade creditors had begun to file lawsuits and place liens on the Resort and related property.  See Trial Ex. 60.

[57]  See Test. of Joseph Billhimer, Cash Collateral Hr'g, (Oct. 3, 2006), Trial Ex. 29, at Hr'g Tr. 79:2-80:3.

[58]  Except for disbursements made during the Debtors' bankruptcy case, this disbursement of funds was the only one made after Hurricane Katrina by the Disbursement Agent.  See Test. of David Behenna, Trial Tr. 158:25-159:5.

Noteholders that as a result of the damage and delay caused by Hurricane Katrina, the Debtors were unable to provide the certifications and representations required under the terms of the Disbursement Agreement to access the Insurance Proceeds.  In particular, the Debtors could not certify and represent (1) that the existing budget (formulated before Hurricane Katrina) accurately set forth the anticipated costs to complete the Resort (which costs ballooned because of the need to reconstruct the Resort after Hurricane Katrina); (2) that there were sufficient funds in the Construction Disbursement Account (which did not include any of the Insurance Proceeds) to complete the construction of the Resort by December 31, 2005;[59] and (3) that the Resort would open by December 31, 2005.[60]   The Debtors insist their failure to meet these certifications all related to Hurricane Katrina.[61]   The Debtors complain that the Claimants used this alleged default to their unfair advantage, a strategy that the Debtors referred to at the Adversary Trial as the "Katrina Gotcha."

### The Debtors' Lawsuits Against the Indenture Trustee and the Disbursement Agent

On October 27, 2005, the Debtors filed suit against U.S. Bank, as the Indenture Trustee and Disbursement Agent, in the United States District Court for the Southern District of Mississippi (the "First S.D. Miss. Action")[62] in Case No. 1:05-cv-488-LG-RHW.  The Debtors sought declaratory relief to require U.S. Bank, in its dual roles as the Indenture Trustee and the Disbursement Agent, to disburse $11.5 million from the Construction Disbursement Account for payment of construction expenses for work performed before Hurricane Katrina.  On December 16, 2005, the Debtors filed

---

[59]  Test. of Todd Raziano, Trial Tr. at 448:18-450:22.

[60]  Trial Ex. 51; Test. of Todd Raziano, Trial Tr. at 448:2-17.

[61]  See Test. of Todd Raziano, Trial Tr. 448:23–451:3.

[62]  First Amended Complaint, Trial Ex. 58 at 12.

a second suit in the same federal court (the "Second S.D. Miss. Action") in Case No.1:05-cv-683-DMR-JMR. In that suit, the Debtors sought declaratory relief to require U.S. Bank, again in its dual roles as the Indenture Trustee and Disbursement Agent, to release the Insurance Proceeds received by the Debtors after Hurricane Katrina in order to rebuild and repair the Resort.  The relief sought in both suits, if granted, would have left the Notes in place. On November 16, 2005, by stipulation of the parties, U.S. Bank agreed to release $5,685,480.08 for payment of work performed and materials provided to the Resort before August 26, 2005.[63]  Shortly thereafter, the District Court consolidated the First S.D. Miss. Action with the Second S.D. Miss. Action on January 18, 2006 (the "Consolidated S.D. Miss. Actions").

U.S. Bank and the Noteholders obtained, over the objection of the Debtors, a delay in the trial scheduled to place in October 2006 on the interpretation of the Indenture provisions in the Consolidated S.D. Miss. Actions until March 2007.  The Debtors were concerned that the delay would jeopardize their Hard Rock license[64] and place them at a competitive disadvantage, by permitting their casino competitors to rebuild and reopen ahead of them.[65]

**The Indenture Trustee's Notice of Event of Default**

On January 6, 2006, the Indenture Trustee formally notified the Debtors by letter that: (1) pursuant to § 6.01(o) of the Indenture, an event of default had occurred because of the failure of the

---

[63]  Test. of David Behenna, Trial Tr. at 158:14-24.

[64]  As discussed later, Hard Rock had agreed to extend the Resort's opening deadline until December 31, 2007.  The Debtors believed they could meet this new deadline only if the litigation was resolved before mid-2007.

[65]  Test. of Todd Raziano, Trial Tr. 464:4–465:9; Test. of Joseph O'Connor, Trial Tr. 688:9–22 ("The competitors were all gradually, one by one, reopening post-Katrina. . . . [Premier] was on fumes.").  The Consolidated S.D. Miss. Actions were dismissed without prejudice after confirmation of the Debtors' plan of reorganization.  See Stipulation and Order Resolving U.S. Bank National Association's Amended Motion to Amend the Confirmation Order Pursuant to Bankruptcy Rule 9023 (Bankr. Dkt. 560).

Resort to open by December 31, 2005[66] and (2) pursuant to § 6.01(c) of the Indenture, an additional event of default may have occurred because of the failure of the Debtors to commence timely one or more "Event of Loss" offers to the Noteholders under § 4.11(b) with respect to the Insurance Proceeds held by the Indenture Trustee. The Indenture Trustee claimed that in light of these events of default, either the Indenture Trustee or a specified number of Noteholders had the right under § 6.02 to declare all the Notes immediately due and payable but so far had elected not to do so.[67] The Debtors denied that any event of default had occurred because an act of God had rendered impossible the opening of the Resort by December 31, 2005.[68]

### Purchase of Equity Interest by Leucadia National Corporation

The Debtors sought alternative sources of funding to reconstruct the Resort in the face of their unsuccessful efforts to gain access to the Insurance Proceeds. On or about April 25, 2006, Leucadia National Corporation ("Leucadia") acquired a controlling equity interest in PEB. Leucadia accomplished the purchase by making a capital contribution to GAR, LLC ("GAR")—through its subsidiary LUK-Ranch Entertainment, LLC ("LRE")—with GAR, in turn, acquiring from AA Capital Equity Fund, L.P. and AA Capital Biloxi Co-Investment Fund, L.P. (the "Sellers") all of the Sellers' equity interest in PEB for an aggregate cash purchase price of $89 million.[69]  As a result,

---

[66] Trial Ex. 51.

[67] The Noteholders have never formally waived any event of default or rescinded any automatic acceleration of the Notes.

[68] Under New York law, an act of God is an unusual, extraordinary, and unprecedented event. Prashant Enterp. Inc. v. State, 614 N.Y.S.2d 653, 730 (N.Y. App. Div. 1994).

[69]  See Second Amended Disclosure Statement, at 12 (Bankr. Dkt. 340);  LRE also acquired a subordinated note from Rank America, Inc. for approximately $13.3 million. Rank America, Inc. at that time was the parent company of Hard Rock Café International and Hard Rock Licensing, Inc.  See Second Amended Disclosure Statement, at 20–21 (Bankr. Dkt. 340).

Leucadia controlled the Debtors' board of managers.

**The Hard Rock Agreement**

The license agreement between Hard Rock and the Debtors required Hard Rock's consent to the acquisition by Leucadia. As noted above, the Hard Rock brand was central to the Debtors' business plan. To obtain Hard Rock's consent, Leucadia entered into a letter agreement with Hard Rock (the "Hard Rock Agreement"), under which it made several financing commitments.[70] In return, Hard Rock agreed, *inter alia*, to waive any default under the license agreement arising out of the Debtors' failure to open the Resort by the original opening deadline, and to extend the deadline until December 31, 2007.

As to its financing commitments, Leucadia represented to Hard Rock that Leucadia, or a subsidiary of Leucadia, would commence a tender offer for the Notes at 101% of par value, and would cause the tender offer to be funded independently of the Debtors' resources to avoid any impact on the capital structure of Premier Finance. Leucadia also informed Hard Rock that it intended to reconstruct the Resort using the Insurance Proceeds but agreed to lend up to $50 million to Roy Anderson Corporation ("RAC"), the general contractor on the Resort during both the first construction and the reconstruction, in the event that either:

> (i) the holders of the Bonds fail to release their liens on Premier's insurance proceeds after commencement of the Tender Offer or (ii) Premier is unable to settle its outstanding insurance claims, such that Premier is unable to use insurance proceeds for reconstruction . . . .[71]

Finally, Leucadia agreed to loan up to $11 million in unsecured financing to Premier Finance in the

---

[70] Trial Ex. 54.

[71] Trial Ex. 54 at 2 of 5.

event the Debtors required additional working capital.[72]  In all, Leucadia's commitment totaled $61 million.

**The BHR Bridge Facility**

Consistent with the Hard Rock Agreement, the Debtors obtained two separate commitments, totaling $50 million, from BHR Holdings, Inc. ("BHR"), an affiliate of Leucadia. Under the first commitment, BHR agreed to provide bridge financing (the "BHR Bridge Facility") of up to $40 million by purchasing from RAC any receivables due RAC under the construction agreement entered into between the Debtors and RAC.[73]  Todd Raziano ("Raziano"), senior vice-president and chief financial officer of the Resort, testified at the Adversary Trial that the BHR Bridge Facility was intended to pay the contractors so that they would continue working and that "it was for the purpose of being able to begin construction, give the contractor assurances that progress billings would be paid to the extent that U.S. Bank didn't provide the funds."[74]  The Debtors used these loan proceeds to retire or reduce certain obligations, including some that the Disbursement Agent had previously

---

[72] Hard Rock Agreement, Trial Ex. 54 at 2 of 5.

Following the closing of the Transaction, Leucadia will cause LRE to agree to make an additional capital contribution to GAR of up to $11 million (the "Additional Investment") in the event additional working capital is required by Premier (as determined by GAR's board).  GAR would then use such funds to make an additional capital contribution to Premier.

Id.

[73] See Receivables Purchase Agreement, Trial Ex. 113. Upon purchase, BHR acquired RAC's right to the receivables.  The parties intended the purchase to constitute a "sale of accounts."

[74] Test. of Todd Raziano, Trial Tr. 528:16–529:11, 531:4–8; see also Test. of Joseph O'Connor, Trial Tr. 686:13–687:4 (the BHR Bridge Facility "[a]llowed [the contractors] to start working").

refused to pay.[75]  As it turned out, all efforts toward reconstruction were funded directly or indirectly by the BHR Bridge Facility.[76]

Under the second commitment, BHR agreed to provide up to $10 million in unsecured financing.[77]  The $40 million BHR Bridge Facility, together with the additional $10 million in unsecured financing, was intended to "comply fully" with Leucadia's obligation under the Hard Rock Agreement[78] to provide for the lending by Leucadia of up to $50 million to RAC for reconstruction of the Resort.

Pursuant to these commitments, BHR purchased $11.8 million in receivables from RAC under the BHR Bridge Facility.  Moreover, Leucadia, through its subsidiary, BHR, infused $8 million into PEB in May 2006 and $100,000 in September 2006 by virtue of unsecured loans in order to pay critical vendors whose bills were unpaid and whose services were necessary for the rebuilding of the Resort.[79]  That left the Debtors with more than $40 million in available, committed financing from Leucadia (of which $11 million was equity financing) to be used for reconstruction of the Resort and other expenses.  Both Raziano and Joseph O'Connor ("O'Connor"), vice-president

---

[75]  Second Amended Disclosure Statement, at 21 (Bankr. Dkt. 340).

[76]  David Behenna testified at the Adversary Trial that aside from remediation immediately after Hurricane Katrina, the Indenture Trustee did not release any Insurance Proceeds prior to the commencement of the bankruptcy cases in September, 2006. See Test. of David Behenna, Trial Tr. 175:23–176:4; 177:20–178:2; see also Test. of Todd Raziano, Trial Tr. 528:16–529:11, 531:4–8; Test. of Joseph O'Connor, Trial Tr. 686:13–687:4.

[77]  See Receivables Purchase Agreement § 14, Trial Ex. 113.

[78]  Trial Ex. 113, § 14, at 5 of 11.

[79]  See id. at 2. The Indenture limited the amount of unsecured debt PEB could incur to $10 million.  See Indenture § 4.09(a)(8), Trial Ex. 1; Test. of Todd Raziano, Trial Tr. at 530:5-24; Test. of Joseph O'Connor, Trial Tr. at 708:13-709:3; Trial Exs.112 & 134 at 46:3-11.

of Leucadia, testified at the Adversary Trial that those commitments remained available even after the Debtors commenced their bankruptcy cases in September 2006.[80]

### The Debtors' "Change of Control" Tender Offer

Leucadia's purchase of a controlling interest in the Debtors triggered a requirement under § 4.16 of the Indenture for a "Change of Control" tender offer. Accordingly, BHR made a tender offer on May 5, 2006 at a price of 101% of the principal amount, plus unpaid and accrued interest. No Notes were tendered as a result of this offer.

### The Debtors' Comprehensive Rebuild Proposal

On June 16, 2006, RAC and the Debtors entered into an agreement for reconstruction of the Resort at a guaranteed maximum price of $78,313,766. In conjunction with that agreement and after months of negotiation with the Indenture Trustee, the Debtors submitted on June 29, 2006, a Comprehensive Hurricane Katrina Recovery Proposal (the "Comprehensive Rebuild Proposal") to the Indenture Trustee.[81] This proposal, *inter alia*, left the Notes in place under the Indenture and granted the Debtors access to the Insurance Proceeds to fund the reconstruction of the Resort, even though it did not contemplate completion of the Resort until well after the original December 31, 2005, deadline set forth in the Indenture.[82]

A hurdle to the Indenture Trustee's acceptance of the Comprehensive Rebuild Proposal was its interpretation of the "Event of Loss" provisions under the Indenture. The Indenture Trustee

---

[80] Test. of Todd Raziano, Trial Tr. at 530:5-24; Test. of Joseph O'Connor, Trial Tr. at 709:7-20.

[81] The Comprehensive Rebuild Proposal is discussed in some detail later in this opinion.

[82] See Test. of Joseph Billhimer, Cash Collateral Hr'g (Oct. 3, 2006), Trial Ex. 29, at H'rg Tr. 79:2–80:3; see also Comprehensive Rebuild Proposal, Trial Ex. 55.

interpreted these provisions as requiring the Debtors to use the Insurance Proceeds in an offer to repurchase the Notes from the Noteholders prior to their use by the Debtors to rebuild the Resort.[83] The Indenture defined an "Event of Loss," in part, as "any loss, destruction or damage of such property or asset."[84] The Indenture provided that following a tender offer to the Noteholders, any proceeds that remained could be used for any purpose not otherwise prohibited by the Indenture.[85] Although the Debtors disagreed with the Indenture Trustee's interpretation of the Indenture, they nevertheless agreed in the Comprehensive Rebuild Proposal to make one or more Event of Loss offers pursuant to § 4.11(b) of the Indenture.

### The Debtors' First "Event of Loss" Tender Offer

In the first of two tender offers, PEB offered on June 30, 2006, to purchase $94 million of the $160 million in outstanding Notes in an amount equal to 100% of the principal amount of the

---

[83]  Indenture § 4.11(b), Trial Ex. 1.

[84]  Indenture at 8, Trial Ex. 1.

[85]  Indenture § 4.11(b), Trial Ex. 1.  That provision of the Indenture states:

> (b) Any Net Loss Proceeds that are not reinvested or are not permitted to be reinvested as provided in the first sentence of Section 4.11(a) will be deemed "*Excess Loss Proceeds*."  Within ten days following the date that the aggregate amount of Excess Loss Proceeds exceeds $5.0 million, Premier will make an offer (an "*Event of Loss Offer*") to all Holders of Notes to purchase the maximum principal amount of Notes that may be purchased out of the Excess Loss Proceeds.  The offer price in any Event of Loss Offer will be equal to 100% of principal amount plus accrued and unpaid interest and Liquidated Damages, if any, to the date of purchase, and will be payable in cash.  If the aggregate principal amount of Notes tendered pursuant to the Event of Loss Offer exceeds the Excess Loss Proceeds, the Trustee will select the Notes in the manner described under Section 3.02 hereof.  If any Excess Loss Proceeds remain after consummation of an Event of Loss Offer, Premier may use such Net Loss Proceeds for any purpose not otherwise prohibited by this Indenture and the Collateral Documents.  Upon completion of any such Event of Loss Offer, the amount of Net Loss Proceeds shall be reset at zero.

Id.

Notes, plus accrued and unpaid interest.[86]  PEB intended to use the Insurance Proceeds resulting from the Event of Loss associated with Hurricane Katrina in order to consummate the offer.

On June 30, 2006, contemporaneous with PEB's Event of Loss offer, BHR offered to purchase all of the outstanding Notes in an amount equal to 101% of the principal amount of the Notes, plus accrued and unpaid interest.[87]  As O'Connor explained at the Adversary Trial, the companion offer made by BHR was designed to provide a funding mechanism that would permit the reconstruction of the Resort to continue without depleting the Insurance Proceeds in case any of the Noteholders accepted the Event of Loss offer.[88]

Each of these offers made on June 30, 2006, expired on August 2, 2006, with no Notes being tendered.  The offers at 100% and 101% were far below the price of 105.375% required under the Indenture to redeem the Notes at the first permitted date on February 1, 2008, a year and a half later.

**The Indenture Trustee's Lawsuit to Obtain Approval of the Comprehensive   Rebuild Proposal**

The Indenture Trustee initiated court proceedings in St. Paul, Minnesota, the principal place of its corporate trust business, to obtain approval from the State of Minnesota District Court, Second Judicial District, Ramsey County, pursuant to Minn. Stat. § 501B.16,[89] to take all actions reasonable or necessary to consummate the Comprehensive Rebuild Proposal (the "Minnesota Action"). The

---

[86]  Trial Ex. 80.

[87]  Trial Ex. 81; Trial Ex. 125 at ¶ 19 & n.3, at 7-8; Test. of Joseph O'Connor, Trial Tr. at 676:13-677:10.

[88]  Test. of Joseph O'Connor, Trial Tr. at 676:21–677:25.

[89]  Under Minn. Stat. § 501B.16, a trustee may petition the court for instructions in the administration of a trust and thereby obtain protection for its actions.  See In re Florance, 360 N.W.2d 626 (Minn. 1985).

Comprehensive Rebuild Proposal detailed the amount of cash and commitments needed: (1) to reconstruct and have the project operating by no later than December 31, 2007; (2) to settle overdue outstanding obligations that arose both prior and subsequent to Hurricane Katrina; (3) to fund ongoing operations during the construction period; and (4) to fund an 18-month interest reserve from which semi-annual interest payments on the Notes would be paid. The Comprehensive Rebuild Proposal also outlined how the Insurance Proceeds anticipated to be received by the Disbursement Agent on or before August 31, 2006, would be spent: (1) the purchase at 100% of par, plus accrued but unpaid interest through and including the date of purchase, those Notes tendered under an Event of Loss Offer in accordance with the terms of the Indenture; (2) interest payments on the Notes through August 1, 2007; (3) the payment of certain debts owed to equipment financiers to the extent that their claims had a priority over the Notes; (4) payment of costs to reconstruct, repair, and reopen the Resort; and (5) payment of certain other obligations directly relating to the Resort that arose both prior and subsequent to Hurricane Katrina and were not otherwise prohibited under the Indenture.[90]

On June 30, 2006, the Indenture Trustee filed in the Minnesota Action the Third Petition of U.S. Bank National Association as Trustee for Instructions in the Administration of Premier Trust Pursuant to Minn. Stat. § 501B.16 (the "Petition to Approve the Comprehensive Rebuild Proposal"). Therein, the Indenture Trustee expressly acknowledged the following:

1.  The Indenture Trustee had the discretion to waive any conditions to a disbursement request, including the failure to certify that the Resort could be completed by December 31, 2005;

2.  The Comprehensive Rebuild Proposal appeared to be fair and protected the Noteholders' interests by giving them essentially the investment they bargained for prior to Hurricane Katrina;

---

[90] Id.

3.   The Resort in its present condition produced  no income and the losses could only be stopped by accelerating the indebtedness and selling the damaged Resort or by repairing and reconstructing the Resort so that it may generate income; and

4.   The Comprehensive Rebuild Proposal was an appropriate use of its discretion.[91]

**Insurance Coverage for the 2006-2007 Hurricane Season**

In April 2006, eight months after Hurricane Katrina, the Debtors engaged the services of several insurance experts to determine the appropriate level of insurance coverage for the 2006-2007 hurricane season, including Sawyer Foster/Beecher Carlson (insurance brokers), Shoecraft Burton LLP (insurance coverage attorneys), and Integro (insurance brokers and risk management advisors) (collectively, the "Debtors' Insurance Advisors").[92]  These advisors concluded that the probability of sustaining damage beyond that resulting from Hurricane Katrina in 2005 was remote and, thus, the primary insurance risk related to the value added to the Resort since August 29, 2005 (the value of reconstruction to date), through the end of the 2006 hurricane season.[93]

The Debtors' Insurance Advisors collectively concluded that the worst case scenario was a storm similar in strength to Hurricane Katrina striking the Gulf Coast on October 31, 2006, resulting in the destruction of approximately $34.6 million of work.[94]  It was specifically noted that the risk of substantial further damage had been reduced significantly by the fact that a portion of reconstruction included concrete piers that rendered the casino less susceptible to damage from a hurricane than

---

[91]   See Petition to Approve the Comprehensive Rebuild Proposal ¶¶ 20-28, Trial Ex. 56.

[92]   Property Insurance Placement Executive Summary effective July 21, 2006, Trial Ex. 57, at 1; see also Test. of Joseph Billhimer, Trial Tr. at 767:3–768:17.

[93]   Property Insurance Placement Executive Summary effective July 21, 2006, Trial Ex. 57, at 2.

[94]   Id.; see also Test. of Joseph Billhimer, Trial Tr. at 767:21–768:7.

the barges had.[95]  These changes in the type of construction explained why they believed $88 million of catastrophic insurance was appropriate during the construction phase before Hurricane Katrina but a lesser amount was sufficient in 2006.[96]  The Debtors' Insurance Advisors concluded that there was a 99.95% probability that a loss would not exceed $50 million and that $50 million of coverage was adequate and sufficient to cover property losses that might occur during the remainder of the 2006 hurricane season.[97]

In addition to the qualitative analysis provided by the Debtors' Insurance Advisors as to the type and amount of coverage necessary "adequately" to insure the Resort, the Debtors also considered the cost of insurance coverage and the availability of coverage after Hurricane Katrina. When the Debtors evaluated the insurance market in April and May, 2006, they found that "the dollar amounts for comparable insurance had . . . skyrocketed, and [they] also found that there was very limited capacity out in the marketplace . . . for policies."[98]  Indeed, the premium for $50 million of catastrophic coverage was approximately $4 million.[99]  Before Hurricane Katrina, however, $181

---

[95]  Property Insurance Placement Executive Summary effective July 21, 2006, Trial Ex. 57, at 1.

[96]  Test. of Joseph Billhimer, Trial Tr. at 783:14–784:7; Trial Ex. 73; see Test. of David Behenna, Trial Tr. at 91:22–25 ("The barge had been destroyed, and they were going to change the design of the casino . . . . and there was going to be a change in the square footage, I believe.").

[97]  Test. of Joseph Billhimer, Cash Collateral Hr'g (Oct. 3, 2006), Trial Ex. 29, at H'rg Tr. at 113:13–114:4.

[98]  Id. at 115:18–116:11; see also Test. of Joseph Billhimer, Trial Tr. at 768:18–769:4.

[99]  Property Insurance Placement Executive Summary effective July 21, 2006, Trial Ex. 57, at 1.

million of coverage cost the Debtors only between $800,000 and $900,000.[100]  Following the recommendation of their Insurance Advisors, the Debtors on July 21, 2006, secured an insurance policy that provided up to $149.3 million in coverage for damage to real and personal property, which included a $50 million weather catastrophe occurrence limit through July 21, 2007.[101] Although this $50 million of catastrophic coverage surpassed the $34.6 million worst case scenario predicted by the Debtors' Insurance Advisors,[102] it was far lower than the $181.5 million in coverage under the prior policies.[103]  For that reason, in the Form 8-K[104] filed by the Debtors on July 26, 2006, they expressly disclosed the risk that damages caused by a hurricane during the remainder of the 2006 storm season might exceed the amount of coverage:

> The Company believes that $50 million in WCO [weather catastrophe occurrence] coverage is sufficient to insure the risk of storm related damage that could occur for the duration of the 2006 hurricane season, however, there can be no assurances that the amount of damage that may be caused as a result of a WCO will not in fact exceed the $50 million limit.[105]

The Debtors informed the Indenture Trustee about the new insurance policy on the same date

---

[100]  See Trial Ex. 71.

[101]  See Property Insurance Placement Executive Summary effective July 21, 2006, Trial Ex. 57, at 1.

[102]  See Test. of Joseph Billhimer, Cash Collateral Hr'g (Oct. 3, 2006), Trial Ex. 29, at H'rg Tr. 47:21–49:10.

[103]  Trial Exs. 71, 188, & 57 at 3.

[104]  Under the rules of the Securities and Exchange Commission ("SEC"), issuers of securities subject to either § 13 or § 15(d) of the Securities and Exchange Act of 1934 must file a report on Form 8-K with the SEC when certain events occur. 17 C.F.R. § 240.13a-11; 17 C.F.R. § 240.15d-11. Although not required to do so by the SEC, the Debtors were required by the Indenture to file Form 8-K as if they were.  Indenture § 4.03, Trial Ex. 1.

[105]  Trial Ex. 188, at 2 of 3.

it was bound.[106]   Both the Indenture Trustee and the Noteholders expressed concern about the adequacy of the storm coverage, especially given that the term continued into part of the 2007 hurricane season.[107]

### The Indenture Trustee's Abandonment of the Petition to Approve the Comprehensive Rebuild Proposal

After the disclosure by the Debtors of the $50 million storm insurance coverage and approximately one week before the hearing set for August 8, 2006, on the Petition to Approve the Comprehensive Rebuild Proposal, the Noteholders instructed the Indenture Trustee to delay the hearing until August 25, 2006, and to withhold all payments to the Debtors from the Construction Disbursement Account.[108]   In the end, the Indenture Trustee decided not to proceed with the prosecution of the Petition to Approve the Comprehensive Rebuild Proposal.[109]

### The Debtors' Negotiations with the Noteholders to Rebuild the Resort Using the Insurance Proceeds

In their continued effort to gain access to the Insurance Proceeds, the Debtors met directly with some of the Noteholders on August 16, 2006, in Los Angeles, California.  The Noteholders agreed to waive the event of default under the Indenture and release the Insurance Proceeds if the Debtors, in turn, agreed to provide (1) $75 million of storm insurance coverage for the remainder of the 2006 hurricane season; (2) $130 million of storm insurance coverage, with a $30 million deductible, for

---

[106]   Trial Ex. 188, at 3 of 3.

[107]   Trial Ex. 198; Test. of David Behenna, Trial Tr. at 96:12-18, 97:18-23; Test. of Steven Sylvester, at Dep. Tr. at 47:21-50:3-5, Trial Ex. 28.

[108]   See Test. of Joseph Billhimer, Cash Collateral Hr'g (Oct. 3, 2006), Trial Ex. 29, at H'rg Tr. 80:19–81:25.

[109]   See id. at 82:1–83:11.

the 2007 hurricane season (at an estimated cost of $10-15 million); (3) $25.8 million or more for an

eighteen-month interest reserve; (4) $6 million in reserve for the next annual insurance payment; (5)

payment of the attorneys' fees of the Noteholders;[110] and (6) $783,000 for payment of a premium

for a new builder's risk construction bond.[111] The negotiations failed mainly because the Debtors

objected to the amount of insurance coverage sought by the Noteholders. The Debtors insisted that

§ 4.22(a) of the Indenture did not require them to insure the Resort up to its "replacement value."

Rather, § 4.22(a) only required that the Resort be "adequately insured."[112] The Debtors viewed the

Noteholders' demands as their attempt to rewrite the terms of the Indenture to stipulate the exact

amount of insurance coverage that the Debtors would be required to obtain for every year in the

future while the Notes remained in place.[113] The Debtors complained that the Noteholders ignored

their concerns regarding the limited availability and prohibitive cost of insurance in 2006.[114] Also,

because the cost of the insurance coverage demanded by the Claimants would have exceeded $15

---

[110]  In late 2005, during preliminary negotiations with some of the noteholders, the Debtors agreed to pay their professional fees and expenses in order to garner their cooperation. Test. of Todd Raziano, Trial Tr. at 441:1-442:22. See Trial Ex. 72 (detailing the nearly $3 million of professional fees and expenses paid by the Debtors on behalf of the Claimants from November 18, 2005, through June 30, 2007, of which amount the Debtors paid $919,321.29 on behalf of some of the noteholders). Although the Indenture required the Debtors to pay the reasonable expenses of the Indenture Trustee, there was no similar requirement for payment of the noteholders' expenses. Indenture § 7.07, Trial Ex. 1; Test. of Todd Raziano, Trial Tr. at 441:1-442:22.

[111]  See Trial Ex. 61; Test. of Todd Raziano, Trial Tr. at 458:6–463:19.

[112]  Indenture § 4.22(a), Trial Ex. 1; Test. of David Behenna, Trial Tr. at 100:13–18; see also Test. of Todd Raziano, Trial Tr. at 462:19–463:16; Test. of Joseph Billhimer, Trial Tr. at 772:8–12.

[113]  See Closing Arguments, Trial Tr. at 900:11–901:14.

[114]  See Test. of Todd Raziano, Trial Tr. at 458:22–459:20.

million, the Debtors believed it would jeopardize their ability to rebuild[115] and adversely affect their ability to compete profitably with other casinos.

### The Debtors' Ongoing Negotiations with the Indenture Trustee/Disbursement Agent to Rebuild the Resort Using the Insurance Proceeds

From August 24, 2006, through September 8, 2006, the Debtors submitted to the Disbursement Agent four Construction Disbursement Requests seeking disbursement of the following amounts from the Construction Disbursement Account: (1) $3,338,445 for reconstruction work performed and materials delivered in July 2006; (2) $2,936,94.88 for expenses incurred before Hurricane Katrina; (3) $2,975.156.08 for unpaid remediation expenses incurred after Hurricane Katrina; and (4) $5,946,577 for unpaid expenses relating to the opening of the Resort in 2005 and other subsequent expenses. The Disbursement Agent rejected the Construction Disbursement Requests as defective on their face, *inter alia*, because the required certifications unilaterally changed the deadline for completion of the Resort from December 31, 2005, to December 31, 2007, and incorrectly stated that as of that date no event of default existed.[116] In addition, U.S. Bank, in its dual role as both the Disbursement Agent and the Indenture Trustee, reminded the Debtors that a central concern of the Noteholders was the sufficiency of the amount of storm insurance coverage on the Resort.[117]

---

[115] See Test. of Todd Raziano, Trial Tr. at 463:10–19.

[116] Trial Ex. 62; Test. of Todd Raziano, Trial Tr. at 497:23–499:13; Test. of Joseph Billhimer, Cash Collateral Hr'g (Oct. 3, 2006), Trial Ex. 29, at H'rg Tr. 53:6–60:5; 61:7–62:1; 85:3–12.

[117] Trial Ex. 62.

**The Debtors' Second "Event of Loss" Tender Offer**

On September 1, 2006, again in connection with an Event of Loss offer, PEB offered to purchase $66,816,000 of the $160 million in outstanding Notes in an amount equal to 100% of the principal amount of the Notes, plus accrued and unpaid interest.[118]   For the purchase of these Notes, PEB intended to use all the Insurance Proceeds received by the Disbursement Agent up to that date, minus the $94 million of Insurance Proceeds that were the subject of PEB's prior Event of Loss offer for the Notes dated June 30, 2006.

On September 1, 2006, contemporaneous with PEB's Event of Loss offer, BHR offered to purchase all of the outstanding Notes in an amount equal to 101% of the principal amount of the Notes, plus accrued and unpaid interest.[119]   Each of the offers made on September 1, 2006, expired with no Notes being tendered. At the time of that tender offer, the market price of the Notes ranged from 105% to 106% of principal.

After the Noteholders declined the Event of Loss Offers, the Indenture Trustee once again refused to allow the Debtors to use the Insurance Proceeds.[120]   Instead, the Indenture Trustee maintained that an event of default had occurred under § 6.01(o) of the Indenture because the Debtors failed to open the Resort by December 31, 2005, due to the devastation wrought by Hurricane Katrina.[121]

---

[118] Trial Ex. 82.

[119] Trial Ex. 187.

[120] See Test. of Joseph Billhimer, Cash Collateral Hr'g (Oct. 3, 2006), Trial Ex. 29, at H'rg Tr. 53:6–54:13; 63:7–19.

[121] See id., at 53:6–60:5; 61:7–62:1; 85:3–12. The Debtors contested the Indenture Trustee's interpretation of the Indenture and denied that any event of default had occurred because the failure to open the Resort was an act of God excused by, *inter alia*, impossibility of

Following the initial efforts by the parties to reach agreement on the insurance coverage issue, the Indenture Trustee filed in the Consolidated S.D. Miss. Actions on September 8, 2006, an answer and counterclaim seeking declaratory relief that the Debtors were in breach of the Indenture by virtue of their failure to agree to obtain adequate insurance.[122]  A settlement conference was scheduled to take place on September 25, 2006.[123]

**The Debtors' Decision to File Voluntary Petitions for Relief under the Bankruptcy Code**

The Debtors' board of managers began discussing filing petitions for relief under chapter 11 of the Bankruptcy Code when it became clear to them that an impasse had been reached with the Claimants regarding the insurance coverage issue.[124] One of the topics discussed in connection with that decision was the possibility of repaying the Notes early.[125]  There were also discussions about the existence of the prepayment premium in the Indenture and about structuring the replacement financing to allow for litigation of that claim within the bankruptcy case.[126]

On September 19, 2006, the Debtors' board of managers[127] voted to cause the Debtors to file

_____

performance.

[122]  Trial Ex. 59, at 18-20, ¶¶ 27-33.

[123]  Test. of Todd Raziano, Trial Tr. at 624:20-625:1.  Although at the Adversary Trial the Claimants  referred to a "mediation" scheduled in September 2006 that did not occur as a result of the bankruptcy filing, the "mediation" was a settlement conference before the magistrate judge. Test. of Todd Raziano, Trial Tr. at 624:7–10.

[124]  See Test. of Joseph Billhimer, Cash Collateral Hr'g (Oct. 3, 2006), Trial Ex. 29, at H'rg Tr. 92:8–21.

[125]  Trial Ex. 134, at 113:3-9.

[126]  Trial Ex. 134, at 114:15-115:7.

[127]  Trial Ex. 183, at 20 of 102.

voluntary petitions for relief under chapter 11 of the Bankruptcy Code.[128]   The press release issued

by the Debtors to announce the commencement of the bankruptcy cases attributed the decision

solely to the refusal of the Claimants to allow the Debtors access to the Insurance Proceeds and

quoted the Debtors' chairman of the board of managers, Lawrence S. Hershfield ("Hershfield"), as

saying, "The Company has sufficient resources to pay all its creditors in full and rebuild the casino,

but the Company's bondholders continue to refuse to allow the Company to use its own money . .

. .[T]he quickest way to get access to our cash is to use a bankruptcy reorganization process."[129]

At the time of the bankruptcy filing, the Debtors were not confronting foreclosure and neither

the Indenture Trustee nor the Noteholders had taken any action to accelerate the Notes.[130]   Although

certain creditors were going unpaid,[131] no involuntary bankruptcy had been filed.[132]

**The Debtors File Voluntary Petitions for Relief under the Bankruptcy Code**

Simultaneously, on September 19, 2006, (the "Petition Date"), PEB and Premier Finance  filed

voluntary petitions for relief under chapter 11 of the Bankruptcy Code in Case Nos. 06-50975 and

06-50976, respectively (the "Petitions").  For procedural purposes only, the Court ordered the joint

administration of the Debtors' chapter 11 cases under Case No. 06-50975 pursuant to Rule 1015 of

the Federal Rules of Bankruptcy Procedure.  (Bankr. Dkt. 49).

The Debtors' First Amended Schedules, dated October 20, 2006, showed approximately

---

[128]   Trial Exs. 5, at 3-10 & 6, at 1.

[129]   Trial Ex. 118, at 2.

[130]   Test. of Todd Raziano, Trial Tr. at 591:13-16 & Ex. 125, at 8 & 13 of 38.

[131]   Test. of Todd Raziano, Trial Tr. at 470:9–14; 481:3–8; 506:8–14.

[132]   Test. of Joseph O'Connor, Trial Tr. at 688:23-689:1.

$200,000 in unrestricted cash, assets of $252,862,214.96, and liabilities of $230,142,366.45.[133] Also as of the Petition Date, the Indenture Trustee held approximately $151,610,661 of Insurance Proceeds in several restricted bank accounts.

Together with their Petitions, each of the Debtors filed a Motion Pursuant to Section 363(c) of the Bankruptcy Code and Bankruptcy Rule 4001(b) for Order Authorizing the Use of Cash Collateral on an Interim and Final Basis, whereby they sought access to the Insurance Proceeds (the "Cash Collateral Motion") (Bankr. Dkt. 5). The Debtors did not seek to pay off the Notes under the Cash Collateral Motion. Rather, they sought access to the Insurance Proceeds to rebuild the Resort.[134] U.S. Bank, in its separate capacities as the Indenture Trustee and the Disbursement Agent, and the Noteholders both filed separate objections to the Cash Collateral Motion.[135] They both took the position that the Debtors had no direct ownership rights to the Insurance Proceeds and that the Insurance Proceeds did not constitute "cash collateral" available for use by the Debtors under § 363(c).[136] The Noteholders also took the position that the Insurance Proceeds should remain as

---

[133]  Trial Ex. 65, at 1.

[134]  See Test. of Joseph Billhimer on Oct. 3, 2006, Cash Collateral Hr'g, Trial Ex. 29, at Tr. 193:6–194:2 (Q: "And when rebuilt, the Noteholders will retain their mortgage on all the assets?" A: "Yeah.").

[135]  Preliminary Objection of Majority Holders to Debtors' Motion Pursuant to Section 363(c) of the Bankruptcy Code and Bankruptcy Rule 4001(b) for Order Authorizing the Use of Cash Collateral on an Interim and Final Basis ("Objection of Noteholders to Cash Collateral Motion") (Bankr. Dkt. 37); Objection of U.S. Bank National Association, as Indenture Trustee, to the Debtors' Motion Pursuant to Section 363(c) of the Bankruptcy Code and Bankruptcy Rule 4001(b) for Order Authorizing the Use of Cash Collateral on an Interim and Final Basis ("Objection of U.S. Bank to Cash Collateral Motion") (Bankr. Dkt. 39).

[136]  Objection of U.S. Bank to Cash Collateral Motion, at 1–2, 4 ("U.S. Bank objects to the Motion on the grounds that the Debtors have no direct ownership rights to the funds or accounts in question.").

their security and that Leucadia should fund the cost to rebuild the Resort.[137]

In a September 26, 2006, E-mail to O'Connor, Raziano mentioned a financial analysis for repaying the Notes and referred to a previous conversation along the same vein.[138]  In another September 26, 2006 E-mail to Hershfield, Raziano wrote that he had attached a schedule that "shows the total amount of take out financing that would be required to retire the bonds. . . ."[139]

On October 3 and 4, 2006, the Bankruptcy Court held an evidentiary interim hearing on the Cash Collateral Motion.  At that hearing, Joseph Billhimer, president of the Resort until 2008, testified that the Debtors' intended to leave the Notes in place.[140]

Given the opposition to the Cash Collateral Motion and the Noteholders' continued insistence on $160 million of insurance, the Debtors filed their Motion for Authorization to Obtain Postpetition Financing (the "DIP Financing Motion") (Bankr. Dkt. 71) on October 9, 2006, requesting authorization to obtain post-petition financing in an amount up to $180 million.  Under the DIP Financing Motion, the Debtors proposed to replace the Notes with a substantially similar credit facility from BHR, at the same interest rate of 10.75%.[141]  The Debtors proposed to use the new

---

[137] Objection of Noteholders to Cash Collateral Order, at ¶ 35 ("To the extent that the Debtors assert some 'need' to spend money for purposes that will not generate replacement collateral, those 'needs' must be met by sources other than depletion of the Holders' Cash Collateral.  Leucadia purchased its majority equity interest in Premier for $89 million in April 2006, when it was fully aware of the Debtors' needs for additional funds, and in fact made commitments to provide additional funds in connection with the proposal made to the Trustee.").

[138] Trial Ex. 122.

[139] Trial Ex. 123.

[140] Test. of Joseph Billhimer, Cash Collateral Hr'g (Oct. 3, 2006), Trial Exs. 29, H'rg Tr. at 193:25-194:2, & 29A at 2-3.

[141] Trial Exs. 125, at 16 of 38, & 8, at 2 of 2.

financing to repay the Notes at par, plus accrued interest.  In order to effectuate the immediate release of the Insurance Proceeds, the Debtors also proposed to fund an escrow in the amount of $12.9 million pending litigation with the Claimants to resolve any claim resulting from prepayment of the Notes.[142]  Both the Noteholders and U.S. Bank objected to the DIP Financing Motion.

In the meantime, on October 10, 2006, the Court entered its Opinion (Bankr. Dkt. 75) and Interim Order (Bankr. Dkt. 76) approving the Debtors' use of approximately $26 million in Insurance Proceeds in accordance with the Debtors' 13-week projected budget for payment of current and ongoing reconstruction costs until December 17, 2006, or the date of a final hearing, whichever came first. On October 23, 2006, the Court entered an Order in Furtherance of Interim Order on Debtors' Motion for Use of Cash Collateral (Bankr. Dkt.114), which reflected certain agreements of the parties with respect to the procedures for the release of the Insurance Proceeds and payment by the Debtors of fees and expenses of the Indenture Trustee and its counsel.  The Court in its Order Extending Interim Order on Debtors' Motion for Use of Cash Collateral (Bankr. Dkt. 205) extended the expiration date through January 20, 2007, as limited by the Debtors' revised budget.

On December 21, 2006, the Indenture Trustee filed Proof of Claim Nos. 101, 102, 108, and 115 pursuant to Rule 3003 of the Federal Rules of Bankruptcy Procedure, as follows:

   1. Claim Nos. 101 and 108 each asserted secured claims against PEB for all claims due and owing under the Indenture through the Petition Date.

   a. Claim No. 101 was based upon the provisions of § 7.07(a) of the Indenture regarding the payment of reasonable compensation to the Indenture Trustee, including the expenses of its counsel.  Claim No. 101 was filed in an unliquidated amount.

---

[142]  Trial Ex. 125, at 25 of 38.

b. Claim No. 108 was filed by the Indenture Trustee on behalf of the Noteholders and was based on PEB's obligation under the Indenture to pay the Notes. Claim No. 108 was filed in the liquidated amount of $162,341,111.12, which included $160 million in principal and $2,341,111.12 in unpaid interest. Notably, Claim No. 108 provided that "[n]othing herein is intended to constitute an acceleration of the [Notes]." Claim No. 108 also included a claim for damages as provided for in § 6.02 of the Indenture to the extent the Notes were prepaid before February 1, 2008.

2. Claim Nos. 102 and 115 each asserted secured claims against Premier Finance that were identical to those set forth in Claim Nos. 101 and 108 against PEB.

On December 21, 2006, the Disbursement Agent[143] filed Proof of Claim Nos. 103 and 104. Claim Nos. 103 and 104 each asserted unliquidated secured claims against PEB and Premier Finance, respectively, for obligations due and owing under § 8 of the Disbursement Agreement as to the Debtors' obligation to indemnify, hold harmless, and defend the Disbursement Agent. Claim Nos. 103 and 104 also asserted a claim of payment of $6,000 per year to the Disbursement Agent for compensation for its services under § 3.3.1 of the Disbursement Agreement.

Following a three-day hearing that began on January 16, 2007, the Court issued its Opinion (Bankr. Dkt. 299) and Order (Bankr. Dkt. 300), denying the Debtors' DIP Financing Motion, in part, because the payment the Debtors sought authorization to make would impair or modify the rights of the Noteholders under the Indenture over their objections (the "DIP Financing Opinion") (Bankr. Dkt. 299). The Court determined that allowing the case to proceed to the confirmation process would better protect the rights of all the parties and the estate.

**The Debtors' Disclosure Statement and Plan of Reorganization**

Before the hearing on the DIP Financing Motion, the Debtors on December 11, 2006, filed their original Disclosure Statement for Debtors' Joint Plan of Reorganization under Chapter 11 of the

---

[143] As noted previously, U.S. Bank acted as both the Indenture Trustee and the Disbursement Agent under the parties' financing arrangement.

Bankruptcy Code (Bankr. Dkt. 216). After this Court denied the DIP Financing Motion, the Debtors

on February 23, 2007, filed their Second Amended Disclosure Statement for Debtors' Joint Plan of

Reorganization under Chapter 11 of the Bankruptcy Code (the "Disclosure Statement") (Bankr. Dkt.

340) and related Plan of Reorganization (the "Plan") (Bankr. Dkt. 337). The Plan provided for a

100% recovery to the holders of allowed claims under the Plan. The Plan also provided payment

to the Noteholders of the Notes at par value plus accrued unpaid interest through the effective date

of the Plan.

Under the Plan, payment of the Notes would extinguish the liens of the Noteholders and thereby

release the Insurance Proceeds to the Debtors. The Noteholders opposed the repayment of the Notes

and insisted that in addition to payment in full under the Plan, they were entitled to damages if the

Debtors paid the Notes before February 1, 2008, the end of the No-Call Period.[144] The Debtors

disputed the Noteholders' entitlement to any prepayment premium but nevertheless agreed to fund

an interest-bearing escrow account in the amount of $10.75 million[145] (the "Disputed Liquidated

Damages Escrow") for the payment of their claims (the "Disputed Liquidated Damages Claims"),

---

[144] See Preliminary Objection of Majority Noteholders to Debtors' Motion for
Authorization to Obtain Postpetition Financing, ¶¶ 46–63 (Bankr. Dkt. 143). The claims relating
to such a prepayment premium were defined in the Plan as the "Disputed Liquidated Damages
Claims." See Plan § 1.33.

[145] The Disputed Liquidated Damages Escrow is defined in the Plan as "that certain
escrow account with U.S. Bank (for the benefit of the holders of Allowed Secured Bond Claims)
(i) in the name of U.S. Bank, (ii) maintained at U.S. Bank, (iii) which account shall earn interest
at a rate equal to the ninety (90) day certificate of deposit rate as announced by U.S. Bank from
time to time, and which interest shall be credited thereto and held therein as part thereof, (iv)
which account shall be maintained by U.S. Bank for the payment of the Disputed Liquidated
Damages Claims, until such time as the Bankruptcy Court determines the Indenture Trustee's
and the Bondholders' entitlement to the Disputed Liquidated Damages Amount by Final Order,
and (v) to which the Indenture Trustee and the holders of Allowed Secured Bond Claims have
been granted first priority liens and security interests pending resolution by settlement or Final
Order of the Disputed Liquidated Damages Claims." See Plan § 1.34.

until such time, including post-confirmation, if necessary, as the Court could determine whether the Claimants were entitled to such damages.  The Debtors based the amount of the Disputed Liquidated Damages Escrow on the maximum amount of damages provided in § 6.02 of the Indenture for pre-payment of the Notes before February 1, 2008.  The amount provided under § 6.02 for the year 2007, 106.71875%, computed to $10.75 million in damages.[146]  The Plan further granted the Noteholders first priority liens and security interests in the Disputed Liquidated Damages Escrow pending the resolution of the Disputed Liquidated Damages Claims.[147]  The Plan also set aside $1 million to pay the Indenture Trustee's reasonable fees and expenses incurred after substantial consummation of the Plan in connection with the litigation of the pre-payment issue (the "Fee Reserve") (Bankr. Dkt. 560).

With regard to the Debtors' other creditors, the Plan provided that holders of general unsecured claims would receive 50% of their allowed claims, including post-petition interest at the federal judgment rate, upon the effective date of the Plan, and the remaining 50% no later than sixty (60) days thereafter.  Other secured and priority claims would be paid in full, including interest, on the effective date of the Plan.[148]

In the Disclosure Statement, the Debtors proposed to enter into a credit facility with BHR upon consummation of the Plan on substantially the same terms as those set forth in their DIP Financing Motion, which the Court had previously denied.  The Disclosure Statement explained that BHR

---

[146] The damages amount is expressed as a percentage of $160,000,000, the principal amount of the Notes, as follows: $160,000,000 x 106.71875% = $170,750,000 and $170,750,000 - $160,000,000 = $10,750,000.  See Test. of Steven Sylvester, Confirmation H'rg (June 22, 2007), Trial Ex. 37, at H'rg Tr. 121:17-122:10.

[147] See Plan § 1.34.

[148] See id. §§ 4.1–4.3, 4.7.

would provide an exit facility (the "Exit Facility")[149] in the amount of approximately $180 million, which would fund, *inter alia*, all distributions under the Plan, the Disputed Liquidated Damages Escrow, and the Debtors' post-confirmation working capital.[150]

On March 5, 2007, the Court entered its Second Supplemental Order in Furtherance of Interim Order on Debtors' Motion for Use of Cash Collateral (Bankr. Dkt. 349), extending the term of the Interim Order through April 14, 2007. By this point in the bankruptcy case, it became evident to all parties that the Debtors were going to complete and reopen the Resort using the Insurance Proceeds, which the Court authorized U.S. Bank to be release through the aforementioned series of supplemental cash collateral orders.[151]

The dispute over storm insurance coverage came to crisis in the bankruptcy case at a hearing held on April 13, 2007, regarding the Debtors' further use of the Insurance Proceeds in conjunction with an additional extension of the Interim Order set to expire by its own terms on April 14, 2007. After negotiations, the Debtors agreed to provide additional adequate protection to the Noteholders for further use of the Insurance Proceeds in the amount of $130 million in catastrophic storm insurance for the 2007 hurricane season. The Debtors agreed to provide the first tier of $100 million by April 20, 2007 and the remaining tier of $30 million by April 27, 2007. The cost to the Debtors to obtain the $130 million in coverage was $7.8 million.[152] The Debtors named the Indenture Trustee as the sole loss payee under the insurance for the benefit of the Noteholders. In return, the

---

[149] See Draft Credit Agreement Between Premier and BHR Holdings, Trial Ex. 147.

[150] See id. at 30–31.

[151] Trial Exs. 20, 69 & 70.

[152] Trial Ex. 71.

Debtors' use of the Insurance Proceeds was extended to June 16, 2007.[153]

In the Claimants' Post-Trial Brief, the Claimants argued that prepayment of the Notes gave the Debtors the flexibility to spend much less on insurance than was required to comply with the Indenture's insurance covenant.  Indeed, in the years following the confirmation of their Plan, the Debtors obtained only $100 million of catastrophic storm insurance coverage, spending less than $4 million per year in premiums for that amount since 2008.[154]  According to the Claimants, the prepayment of the Notes proposed under the Plan (rather than reinstatement of the Notes) allowed the Debtors to achieve their business objective of reducing their insurance costs.

**Votes on the Plan**

The Plan was accepted by every secured and unsecured creditor that voted on the Plan, other than the Noteholders, who voted overwhelmingly to reject the Plan.[155]  The Noteholders and the Indenture Trustee each filed objections to the Plan[156] and briefs in support of their respective positions.[157]

---

[153]  Third Supplemental Order in Furtherance of Interim Order on Debtors' Motion for Use of Cash Collateral (Bankr. Dkt. 400).

[154]  Trial Ex. 71.

[155]  See Certification of David Hartie with Respect to the Tabulation of Votes on the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (Bankr. Dkt. 391).

[156]  See Preliminary Objection of Majority Noteholders to Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (Bankr. Dkt. 386); Preliminary Objection of U.S. Bank National Association as Indenture Trustee to Confirmation of Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Dated February 22, 2007 (Bankr. Dkt. 387).

[157]  Opening Brief of Majority Noteholders in Support of Objection to Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (Bankr. Dkt. 418); Corrected Memorandum of Law of U.S. Bank National Association, as Indenture Trustee, In Support of

**Confirmation Hearing**

The Court held a week-long confirmation hearing on June 18-22, 2007.[158] The Claimants offered testimony from Steven R. Sylvester ("Sylvester"), a senior analyst employed by Deutsche, who stated that the Noteholders preferred to maintain their investment in the Debtors and receive the stream of interest payments under the Notes.[159] He also testified that except for insurance issues, which for the 2007 hurricane season had been resolved, he did not foresee any problems with the relationship with the Debtors if the Notes were left in place.[160]   He further testified that if the Debtors insisted on repaying the Notes, they had to defease the Notes pursuant to § 12.01 of the Indenture, rather than satisfy any claims through later litigation.[161]  In that regard, Sylvester insisted that the Noteholders were prepared to waive any event of default to permit defeasance of the Notes pursuant to the terms of the Indenture.[162]  Moreover, he testified that the escrow proposed under the Plan was underfunded because it was less than the defeasance amount.  This amount would require $160 million of principal plus $8.6 million of interest due on August 1, 2007, and on February 1,

---

Objection to Confirmation of Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Dated February 22, 2007 (Bankr. Dkt. 419); Reply Memorandum of Law of U.S. Bank National Association, as Indenture Trustee, in Support of Objection to Confirmation of Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Dated February 22, 2007 (Bankr. Dkt. 440); Reply Brief of Majority Noteholders in Opposition to Confirmation of Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (Bankr. Dkt. 441).

[158]  Confirmation Hr'g (June 18-22, 2007), Trial Exs. 33-37.

[159] Test. of Steven Sylvester, Confirmation Hr'g (June 22, 2007), Trial Ex. 37, Hr'g Tr. at 71:15-22.

[160]  Id. at 95:1-96:7.

[161]  Id. at 88:15-20, 99:14-101:7.

[162]  Id. at 126:25-127:17.

2008, plus a prepayment premium in the amount of $8.6 million, or payment in cash or government securities having a value of $185,800,000, after accounting for interest on the government securities between deposit dates and due dates for payments on the Notes.[163]

### The Reopening of the Resort

Just days after the confirmation hearing, the Resort reopened to much fanfare on June 30, 2007. As expected, the release of the Insurance Proceeds through the series of cash collateral orders allowed the Debtors to fund the reconstruction of the Resort.

### Confirmation of the Plan

On July 30, 2007, the Court issued an Opinion (the "Confirmation Opinion") (Bankr. Dkt. 468) and Order (the "Confirmation Order") (Bankr. Dkt. 469 ) confirming the Plan, conditioned upon a modification to increase the Disputed Liquidated Damages Escrow by $2,960,115.32.[164] The Court did not make a determination in the Confirmation Opinion as to the applicability of § 6.02. Rather, in light of the Claimants' argument that § 12.01 was the applicable section under the Indenture, the Court increased the Disputed Liquidated Damages Escrow by $2,960,115.32 to reflect the shortfall between § 6.02 and § 12.01. Notably, the Indenture Trustee itself recognized that confirming the Plan with the proposed increase would avoid potential delay in the confirmation process while at the same time protecting the rights of the Noteholders.[165]

On August 1, 2007, the Debtors filed the Second Modification to Debtors' Joint Plan of

---

[163]   Id. at 97:3-100:25; see Trial Ex. 148.

[164]   Confirmation Opinion, at 22 of 29 (Bankr. Dkt. 468). This additional amount, $2,960,115.32, represented the amount of government securities sufficient to pay the Noteholders $185,800,000, the amount they claimed they were owed.  See Trial Ex. 148 (setting forth in detail the calculations used to arrive at this amount).

[165]   Confirmation Opinion, at 22 of 29 (Bankr. Dkt. 468).

Reorganization under Chapter 11 of the Bankruptcy Code, dated February 22, 2007 (Bankr. Dkt. 470).  This modification increased the Disputed Liquidated Damages Escrow to $13,710,115.32.

**Appeal and Stay Motions Filed by the Noteholders**

On August 2, 2007, the Noteholders filed a Notice of Appeal (the "Noteholders' Confirmation Appeal") (Bankr. Dkt. 473) and an Emergency Motion of Majority Noteholders for Stay of Confirmation Order Pending Appeal or, Alternatively, a Temporary Stay to Allow the Majority Noteholders the Opportunity to Seek Expedited Relief in District Court; and Request for Expedited Hearing (the "Bankruptcy Court Stay Motion") (Bankr. Dkt. 474).  On August 9, 2007, the Bankruptcy Court heard oral argument on the Bankruptcy Court Stay Motion and took the matter under advisement.  On the same day, the Noteholders filed  in the United States District Court for the Southern District of Mississippi (the "District Court") an Emergency Motion for Temporary Stay of Bankruptcy Court Confirmation Order Pending Appeal; for Stay Pending Appeal and Request for Expedited Hearing, requesting a stay of the Confirmation Order (the "District Court Stay Motion") (Stay Dkt. 1).

On August 10, 2007, the Bankruptcy Court issued an Opinion (the "Bankruptcy Court Stay Opinion") (Bankr. Dkt. 492)  and an Order (Bankr. Dkt. 493) denying the Bankruptcy Court Stay Motion for failure to satisfy the four factors articulated by the Fifth Circuit necessary to obtain a stay.[166] Hours later, the District Court heard oral argument on the District Court Stay Motion and issued a Memorandum Opinion and Order (Stay Dkt. 8), denying the relief requested for the same reasons outlined in the Bankruptcy Court Stay Opinion.

---

[166]  See Bankruptcy Court Stay Opinion at 3 (citing Arnold v. Garlock, Inc., 278 F.3d 426 (5th Cir. 2001)) (Bankr. Dkt. 492).

**Substantial Consummation of the Plan**

On August 10, 2007, the Debtors filed their Notice of Substantial Consummation and Occurrence of Effective Date of Debtors' Confirmed Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (Bankr. Dkt. 494). The Debtors substantially consummated the Plan, by, among other things:

1. closing on the $180 million Exit Facility with BHR;

2. closing on a $20 million equipment financing facility with International Game Technology ("IGT") (the "IGT Facility");

3. distributing $169,105,847.22 (representing $160 million in principal, $8.6 million for the August 1, 2007, interest payment, and $505,847.22 in accrued interest from August 1, 2007, to August 10, 2007) to U.S. Bank for immediate distribution to the Noteholders;[167]

4. distributing $14,710,115.32[168] to U.S. Bank to be placed into the Disputed Liquidated Damages Escrow, representing the Disputed Liquidated Damages Amount, plus $1,000,000.00 to cover the fees and expenses of the Indenture Trustee relating to litigation of the Disputed Liquidated Damages Claims;

5. distributing $1,327,910.96 to Peoples Bank of Biloxi, representing distributions with respect to its Class 4 and Class 4A secured claims and an additional $738,845 to Class 3 secured creditors under the Plan;

6. distributing an additional approximately $37.14 million to holders of Allowed Class 7 Claims, unsecured creditors, and others under the Plan;

7. distributing in excess of $700,000 to professionals and other administrative claimants;

8. preparing and filing numerous new financing statements, deeds of trust and security instruments in favor of new lenders and canceling the existing security documents in favor of pre-petition lenders; and

---

[167] The parties stipulated to this amount. Joint Pre-Trial Order (Adv. Pro. Dkt. 81); see also Stipulation and Order Resolving U.S. Bank National Association's Amended Motion to Amend the Confirmation Order Pursuant to Bankruptcy Rule 9023 (Bankr. Dkt. 560).

[168] This amount includes the prepayment premium of $8.6 million, and all principal and interest on February 1, 2008, the first redemption date.

    9. operating the Resort, including the payment of the Debtors' regular operating expenses, payroll, taxes, property and equipment leases and entering into numerous binding contracts with third parties.

As a result of the Debtors' substantial consummation of the Plan, the Debtors repaid the Notes before February 1, 2008, the end of the No-Call Period.

    On August 16, 2007, the Indenture Trustee filed the U.S. Bank National Association's Amended Motion to Amend or Modify the July 30, 2007 Order Pursuant to Rule 9023 to Address Unresolved Plan Confirmation Issues (the "9023 Motion") (Bankr. Dkt. 501). The Indenture Trustee sought clarification regarding its role post-confirmation and, more particularly, its compensation for certain services specified in the Plan rendered post-confirmation. The parties agreed to resolve the 9023 Motion, as follows: (1) the Indenture Trustee agreed to continue to serve in its role as such from and after August 10, 2007, for the limited purpose set forth in the Plan until such time as it fulfilled its duties; (2) the Debtors agreed to pay the Indenture Trustee $69,542.80 for its fees and expenses incurred on or prior to August 10, 2007; (3) the Debtors agreed to pay the Indenture Trustee an annual administrative fee in the amount of $6,000, plus hourly charges; (4) the Debtors agreed to authorize the Indenture Trustee to draw from the $1 million previously received from the Debtors for payment of the Indenture Trustee's reasonable fees and expenses incurred in connection with the Disputed Liquidated Damages Claims and the Disputed Liquidated Damages Escrow; and (5) the Debtors agreed to seek dismissal of the Consolidated S.D. Miss. Actions against the Indenture Trustee without prejudice. Following the substantial consummation of the Plan, on September 7, 2007, the Debtors filed a Motion to Dismiss Appeal of Confirmation Order as Moot (D.C. App. Dkt. 3) in the District Court, seeking to dismiss the Noteholders' Confirmation Appeal as equitably moot.

**Appeal Filed by the Indenture Trustee**

On October 31, 2007, the Indenture Trustee filed a Notice of Appeal to the United States District Court for the Southern District of Mississippi, appealing the Confirmation Order (Bankr. Dkt. 561).[169]   The District Court entered a Stipulated Order Consolidating Appeals (together, the "Confirmation Appeal") (D.C. App. Dkt. 13) on December 3, 2007.

**The Adversary**

On November 8, 2007, as provided under the Plan, the Debtors initiated this Adversary against the Indenture Trustee by filing the Complaint to adjudicate the Disputed Liquidated Damages Claims and the parties' entitlement to the proceeds of the Disputed Liquidates Damages Escrow. (Adv. Pro. Dkt. 1).   In the Complaint, the Debtors sought to obtain a declaratory judgment that (1) § 6.02 of the Indenture was inapplicable; (2) repayment of the Notes under the Plan did not equate to "voluntary" prepayment of the Notes under the Indenture; (3) the prepayment premium under the Indenture constituted an unreasonable charge under § 506(b); (4) the defeasance provision of the Indenture, § 12.01, was inapplicable; (5) the Debtors owed no further claims to the Noteholders with respect to the Disputed Liquidated Damages Claims; (6) the liens on the Disputed Liquidated Damages Escrow held by the Claimants were released; (7) the Indenture was cancelled; (8) the Debtors had no further obligation to the Claimants under the Indenture; and (9) all claims owed to the Claimants under the Indenture were discharged.   See Complaint ¶¶ 61-72. The Debtors also objected to Proofs of Claims Nos. 101, 102, 103, 104, 108, and 115 on grounds that the claims were satisfied under the Plan and/or that the Indenture Trustee was not entitled to any additional

---

[169]   The 9023 Motion was not resolved until October 29, 2007. (Bankr. Dkt. 560).   As noted previously, the Noteholders had filed the Noteholders' Confirmation Appeal on August 2, 2007.

monies or damages.[170]  See id.  ¶¶ 73-82.

On December 27, 2007, the Indenture Trustee filed an Answer and Counterclaims of U.S. Bank National Association, as Indenture Trustee Under the Trust Indenture, Dated as of January 23, 2004, to Debtors' Complaint (the "Indenture Trustee Answer") (Adv. Pro. Dkt. 7).   In the Indenture Trustee Answer, the Indenture Trustee pled five affirmative defenses: (1) failure to state a claim upon which relief can be granted; (2) lack of subject matter jurisdiction; (3) unjust enrichment; (4) failure to join the Noteholders as indispensable parties; and (5) estoppel and/or collateral estoppel.   (Adv. Pro. Dkt. 7).   The Indenture Trustee named the Noteholders as "nominal defendants" but sought no relief from them and asserted four counterclaims against the Debtors.

On January 22, 2008, the Debtors filed a Motion to Strike Certain Affirmative Defenses and Joinder of Majority Bondholders and to Require Defendant to Replead Counterclaims Pursuant to Fed. R. Civ. P. 12 and 14 and Fed. R. Bankr. P. 7008 (the "Motion to Strike") (Adv. Pro. Dkt. 10). On January 28, 2008, the Noteholders filed an Answer to Counterclaims of U.S. Bank National Association and Counterclaims of Pacific Investment Management Company, LLC, Deutsche Asset Management, Western Asset Management, and Castlerigg Master Investments Ltd. Against Premier Entertainment Biloxi LLC (d/b/a Hard Rock Hotel & Casino Biloxi) and Premier Finance Biloxi Corp. (Adv. Pro. Dkt. 17).   The Indenture Trustee and the Noteholders filed separate responses to the Motion to Strike on February 12, 2008 (Adv. Dkt. Pro. 21 & 22). On March 4, 2008, this Court entered an Order (Adv. Pro. Dkt. 29), granting the Debtors an additional twenty days to respond to the counterclaims filed by the Indenture Trustee subsequent to the Court's resolution of the Motion

--------

[170] Although the Complaint seeks a declaratory judgment with respect to all of the proofs of claims filed by the Indenture Trustee, the only proofs of claims related to the Disputed Liquidated Damages Escrow are Claim Nos. 108 and 115.

to Strike.  Later, this Court entered an Order (Adv. Dkt. Pro. 36) holding the Motion to Strike in abeyance pending the final outcome of the Confirmation Appeal.

**Dismissal of Confirmation Appeal as Equitably Moot**

On March 19, 2008, the District Court entered a Memorandum Opinion and Order Granting Appellees' Motion to Dismiss (the "District Court Dismissal Order") (D.C. App. Dkt. 28), dismissing the Confirmation Appeal as equitably moot.  On April 17, 2008, the Noteholders filed a Notice of Appeal to the United States Court of Appeals for the Fifth Circuit (D.C. App. Dkt. 29), appealing the District Court Dismissal Order.  Shortly thereafter, the Indenture Trustee likewise appealed the District Court Dismissal Order to the Fifth Circuit. (D.C. App. Dkt. 31).  The Fifth Circuit on June 9, 2009, issued a *per curiam* opinion affirming the District Court Dismissal Order. See Premier Entm't Biloxi LLC v. Pac. Inv. Mgmt. Co. (In re Premier Ent'mt Biloxi LLC), No. 08-60349, 2009 WL 1616681 (5th Cir. June 9, 2009). Of significance to this matter, the Fifth Circuit rejected the Claimants' alternative argument on appeal that the Court award them the funds in the Disputed Liquidated Damages Escrow.  The Fifth Circuit noted that the Plan provided a mechanism for determining the Claimants' entitlement to the funds through litigation in an adversary proceeding and concluded that awarding them the funds would be tantamount to unwinding the provisions of the Plan.

**The Adversary Trial**

Just prior to a rescheduled hearing on the Motion to Strike in the Adversary, the parties agreed to resolve the jurisdictional and joinder issues.  In that regard, the Court entered a Stipulated Order (Adv. Pro. Dkt. 49) on November 3, 2009, in which the Indenture Trustee agreed to omit certain affirmative defenses from the Indenture Trustee Answer and the Debtors, in turn, agreed to allow

the Noteholders to intervene as defendants and counter-claimants.[171]  Accordingly, on November 9, 2009, the Claimants jointly filed the Amended Answer.  Thereafter, the Debtors on November 27, 2009,  filed an Answer to Amended Counterclaim (Adv. Pro. Dkt. 52). The Adversary Trial, as contemplated in the Plan and by the Fifth Circuit in its decision affirming the District Court Dismissal Order, took place from March 16, 2010, through March 19, 2010. The Claimants contend that they are entitled to payment of all of the funds in the Disputed Liquidated Damages Escrow, but they do not seek any amount in excess of those funds, whereas the Debtors contend that they are entitled to the full return of those funds.[172]

**Discussion**

More specifically, the Claimants contend that they are entitled to payment from the Disputed Liquidated Damages Escrow under § 506(b) or, in the alternative, under § 502(b).  As oversecured creditors, they insist that they are entitled under § 506(b) to an allowed secured claim in the amount of $10,750,000 plus default interest of $3,284,125.  The secured claim, according to the Claimants, is for an additional premium payable under § 6.02 of the Indenture, resulting from the Debtors' willful breach of the Indenture with the intention of avoiding the prepayment premium for early redemption of the Notes. The Claimants declare that the Debtors willfully defaulted in two ways: (1) they filed their Petitions on September 19, 2006, which constituted an event of default under § 6.01(j) of the Indenture; and (2) they filed and consummated a plan of reorganization providing for prepayment of the Notes in violation of § 3.07(b) of the Indenture.  The Claimants maintain that

---

[171]  Western Asset Management no longer sought to be joined in the Adversary and is no longer a named party.  See supra note 39.

[172]  See Joint Pre-Trial Order (Adv. Pro. Dkt. 81).

the additional premium under § 6.02 constitutes a "reasonable charge," and, along with the default interest that has accrued since August 10, 2007, is payable as an allowed secured claim under § 506(b).

In the event that this Court determines that § 506(b) is inapplicable, the Claimants also argue that they are entitled under § 502(b) to an allowed unsecured claim for damages that exists under non-bankruptcy law in one of the following amounts, depending upon the approach adopted by this Court: (1) $10,750,000—if this Court concludes that an additional premium is due and payable under § 6.02 of the Indenture; (2) $12,834,827—if this Court concludes that damages should be measured by the amount the Debtors were required to pay under § 12.01 of the Indenture if they had opted to defease the Notes on August 10, 2007; (3) $9,574,123—if this Court concludes that damages should be measured by the "actual" loss of the expected uninterrupted payment stream, calculated as the difference between the market rate and the contract rate of interest through the end of the term of the Notes, discounted at present value; or (4) $8,600,000—if this Court concludes that the appropriate proxy for damages is the amount of the optional prepayment premium payable at the end of the No-Call Period under § 3.07 of the Indenture. The Claimants argue that along with the default interest that has accrued since August 10, 2007, one of the above stated amounts is payable as an allowed unsecured claim.

## A. The Burden of Proof

The burden of proof in a claim against the assets of a bankruptcy estate lies with the claimant, who must establish the validity and amount of its claims by a preponderance of the evidence. See Calif. State Bd. of Equalization v. Official Unsecured Creditors' Comm. (In re Fidelity Holding Co.), 837 F.2d 696, 698 (5th Cir. 1988). Thus, the Claimants bear the burden of proof to show that

the Debtors owe them a prepayment premium under the terms of the Indenture.

**B.  Was the Indenture an Executory Contract?**

Prior to the Adversary Trial, none of the parties had addressed in any pleading whether the Indenture was an executory contract within the purview of § 365 at the time the Debtors filed their Petitions.  If so, then § 365(e)(1)(B) would arguably render unenforceable any termination or modification of the Debtors' rights under the Indenture based solely on the Debtors' filing of their Petitions and § 365(b)(2)(D) would arguably render unenforceable any prepayment premium.  See 11 U.S.C. § 365.  At this Court's request, the Claimants and the Debtors both discussed in their post-trial briefs the decision of In re Texaco, Inc., 73 B.R. 960, 964 (Bankr. S.D.N.Y. 1987), where the court found that a trust indenture similar to the Indenture at issue here was an executory contract.

Executory contracts, unlike other types of contracts, are afforded special treatment under the Bankruptcy Code.  11 U.S.C. § 365.  The term "executory contract," however, is not defined in the Bankruptcy Code.  A majority of courts applying § 365, including the Fifth Circuit, has adopted the definition formulated by Professor Vern Countryman: A contract is executory when "the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance could constitute a material breach excusing the performance of the other."  See Vern Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L. Rev. 439, 460 (1973); Vern Countryman, Executory Contracts in Bankruptcy: Part II, 58 Minn. L. Rev. 479 (1974); Phoenix Exploration, Inc. v. Yaquinto (In re Murexco Petroleum, Inc.), 15 F.3d 60, 62-63 n.8 (5th Cir. 1994).

Both the Debtors and the Claimants contend that the Indenture does not satisfy Professor Countryman's definition because a breach by the Indenture Trustee of its continuing obligations,

such as its duty to tender notices of default to the Debtors, would not be sufficiently material to excuse the Debtors from their continuing obligation under the Indenture to make interest payments to the Noteholders.  See Debtors' Post-Trial Brief at 53-54; Claimants' Post-Trial Brief at 91-92. In other words, they regard the Indenture Trustee's duties to the Debtors (as opposed to those the Indenture Trustee owed to the Noteholders) as inconsequential. Both the Debtors and the Claimants recognize that this point of view conflicts with the result reached in Texaco, but the Debtors insist that Texaco was wrongly decided and the Claimants note that Texaco does not constitute controlling precedent.  Consequently, it is unnecessary for this Court to decide the issue because all parties concede that the Indenture in this case was not an executory contract. The Court now turns to the main issue presented at the Adversary Trial, whether the Noteholders are entitled to the Disputed Liquidated Damages Escrow as an allowed secured claim under § 506 or as an allowed unsecured claim under § 502.

## C.  Allowed Secured Claim under § 506(b)

Under § 506(b), to the extent that an allowed claim is oversecured, "there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b).  In general, a prepayment premium is recognized as encompassed in the term "charges."[173]  E.g., In re Outdoor Sports Headquarters, Inc., 161 B.R. 414,  424 (Bankr. S.D. Ohio 1993); Imperial Coronado Partners, Ltd. v. Home Fed. Savs. & Loan Ass'n (In re Imperial Coronado Partners, Ltd.), 96 B.R. 997, 1000 (9th Cir. B.A.P. 1989) ("prepayment premium is clearly a 'charge provided for under the agreement'"

---

[173] Arguably, a prepayment premium could be considered "interest" because it is intended to replace the interest lost when a debt is paid before maturity.  However, the parties here treat the prepayment premium as a "charge."

under which such claim arose).  Here, the Debtors have stipulated that the Claimants, at all relevant, times, were oversecured.

The general rules that govern the allowance or disallowance of a claim are set out in § 502.  The extent to which such an allowed claim is secured, however, is determined by reference to § 506.  4 Collier on Bankruptcy ¶ 506.01 (16th ed. 2010).  Consequently, there are two requirements for including a charge as part of an allowed secured claim under § 506(b).  First, the charge at issue must satisfy the provisions of § 502(b)(1), that is, it must be included in a contract provision that is enforceable under applicable state law.  E.g., Noonan v. Fremont Fin. (In re Lappin Elec. Co.), 245 B.R. 326 (Bankr. E.D. Wis. 2000); Fin. Ctr. Assoc. of East Meadow, L.P. v. TNE Funding Corp., 140 B.R. 829, 835 (Bankr. E.D.N.Y. 1992); but see In re A.J. Lane & Co., 113 B.R. 821, 825 (Bankr. D. Mass. 1990) (state law is not binding on federal courts but provides guidance in evaluating prepayment charges).  If it does not, the claim is disallowed under § 502(b)(1).  Second, the charge must be "reasonable," as determined by federal law.  Blackburn-Bliss Trust v. Hudson Shipbuilders, Inc., In re Hudson Shipbuilders, Inc., 794 F.2d 1051, 1056 (5th Cir. 1986).  Thus, the Claimants had the ultimate burden of proving at the Adversary Trial that an additional premium of $10.75 million was in fact due and payable to the Noteholders under § 6.02 of the Indenture, that the premium is valid under New York law,[174] and that the premium constituted a "reasonable" charge under federal law.  For the reasons that follow, it is not necessary for this Court to address the validity of the premium under New York law or the reasonableness of the premium under federal law.

---

[174] As previously noted, New York law governs under the Indenture. See Indenture § 14.09, at 109 of 113, Trial Ex. 1.

Section 6.02 of the Indenture provided that if before February 1, 2008, an event of default was caused by a willful action of the Debtors done with the intention of avoiding the No-Call Provision, then a prepayment premium was due. The Claimants rely upon two separate events of default:  a) the filing of the Petitions (the "Petition Default"); and b) the consummation of the Plan under which the Debtors redeemed the Notes prior to the end of the No-Call Period (the "Plan Default").

As to the Petition Default, the Debtors concede that the filing of the Petitions constituted an event of default under § 6.01(j) of the Indenture.  However, as to the Plan Default, the Debtors argue that the repayment of the Notes was not an event of default, as that term is defined under § 6.01 of the Indenture.  As to both alleged events of default, they challenge the Claimants' contractual right to the premium under § 6.02 on two grounds.  First, they dispute that either event of default was "willful."  Second, they dispute that they had any "intention" of using either event of default to avoid the Indenture's prohibition on early redemption of the Notes.  As to the Plan Default only, the Debtors further argue that the repayment of the Notes was not a breach of the Indenture because the Notes were accelerated automatically by the Debtors' filing of the Petitions, which caused the Notes to "mature."

**1.  The Petition Default**

Much of the evidence presented at the Adversary Trial focused upon whether the filing of the Petitions by the Debtors was "willful" and taken by the Debtors "with the intention of avoiding the prohibition on redemption of the Notes" during the No-Call Period.  In that regard, the fact that the Debtors filed their Petitions voluntarily does not in itself resolve the issue.  Instead, this Court must engage in a fact-specific inquiry into the particular circumstances surrounding their filings.

According to the Debtors, they filed the Petitions to gain access to the Insurance Proceeds in

order to rebuild the Resort by December 31, 2007, as they had agreed to do under the Hard Rock Agreement, [175] or they risked losing the Hard Rock license. According to the Claimants, however, the Debtors sought bankruptcy relief in order to gain a potential windfall unavailable outside bankruptcy—the opportunity to redeem the Notes early, avoid paying the prepayment premiums, and eliminate their contractual obligation to provide "adequate insurance."

Both the Debtors and the Claimants, citing New York law, argue in favor of using the definitions of "willful" and "intention," taken from Black's Law Dictionary. See Swezey v. Marra, 143 A.D.2d 827, 829 (N.Y. App. Div.1988) (relying on Black's Law Dictionary to define "willful" in a contract dispute when the contract failed to provide a definition). "Willful" is defined as "[v]oluntary and intentional, but not necessarily malicious," and willfulness is defined as "[t]he fact or quality of acting purposefully or by design; deliberateness; intention." Black's Law Dictionary 1737 (9th ed. 2009). "Intention" is defined as "[t]he willingness to bring about something planned or foreseen; the state of being set to do something." Black's Law Dictionary 826 (9th ed. 2009).

The Debtors proved at the Adversary Trial that just prior to the Petition Date, they had only $200,000 in cash, $230 million in outstanding liabilities, and a Resort that was not generating any revenue.[176] Multiple vendors who had performed work for the Debtors prior to Hurricane Katrina on August 29, 2005, had not been paid in more than one year and had filed, or were threatening to file, suit against the Debtors. Still other vendors were threatening to file mechanics' liens against the property.[177] Also, the Debtors believed that the level of storm insurance coverage demanded

---

[175] Test. of Todd Raziano, Trial Tr. 453:14–454:5; Trial Ex. 54.

[176] Test. of Saul Solomon, Trial Tr. 363:4–7, 13–17.

[177] Test. of Todd Raziano, Trial Tr. 467:16–468:4; Trial Ex. 60.

by the Noteholders would have depleted the Insurance Proceeds to such an extent that there would not have been sufficient money left in the Construction Disbursement Account to implement the Debtors' Comprehensive Rebuild Proposal.[178]   They contend that they were forced to choose between a rock—opposing the Noteholders—and a hard place—acquiescing to the Noteholders' demands, because both options would have resulted in their losing the ability to rebuild the Resort by December 31, 2007, and, more importantly, in their losing the Hard Rock license.

At the Adversary Trial, the Claimants cast the Debtors as "willfully" rushing to bankruptcy court without exploring all the options available to them. The Debtors, however, had been negotiating for the release of the Insurance Proceeds for over a year before they commenced their bankruptcy cases. In the aftermath of Hurricane Katrina, the Debtors tendered several disbursement requests to the Disbursement Agent, who denied them all on the ground that the Debtors could not certify that the Resort would open by December 31, 2005.  The Debtors then filed the Consolidated S.D. Miss. Actions seeking release of the Insurance Proceeds, which if successful would have left the Notes in place.  Then, on January 6, 2006, the Indenture Trustee formally notified the Debtors that they were in default of the Indenture because of the failure of the Resort to open by December 31, 2005. During the summer of 2006, the Debtors put together the Comprehensive Rebuild Proposal with the input and assistance of the Indenture Trustee, which also would have kept the Notes in place.[179] However, the Indenture Trustee abandoned the Petition to Approve the Rebuilding Proposal at the request of the Noteholders because of a new dispute, the adequacy of storm insurance coverage.[180]

---

[178] Test. of Todd Raziano, Trial Tr. 463:1–9.

[179] <u>See</u> Test. of Todd Raziano, Trial Tr. 451:7–452:9, 452:17–24; <u>see also</u> Trial Ex. 55.

[180] <u>See</u> Test. of Todd Raziano, Trial Tr. 456:15–462:16; <u>see also</u> Test. of David Behenna, Trial Tr.172:22–173:11; Test. of Steven Sylvester, Confirmation Hr'g (June 22, 2007), H'rg Tr.

The Debtors then began negotiating directly with the Noteholders, who in return for their agreement to release the Insurance Proceeds, sought concessions from the Debtors that were clearly outside the scope of the Indenture.[181]  Thus, it is clear that the filing of the Petitions was not the result of the Debtors' rush to repay the Notes, as portrayed by the Claimants at the Adversary Trial.

The Claimants take issue with *when* the Debtors filed their Petitions—less than one week before a scheduled judicial settlement conference was scheduled to take place in the Consolidated S.D. Miss. Actions on September 25, 2006.  They contend that it was entirely possible that the settlement conference would have resolved their dispute over the adequacy of storm insurance coverage and that the bankruptcy cases would have been unnecessary.  However, it was just as likely that the settlement conference would have proven pointless since it was not the first such attempt at settlement between the parties.  While Rule 16(a)(5) of the Federal Rules of Civil Procedure authorizes courts to facilitate settlement, that provision does not authorize courts to impose settlement on an unwilling litigant.  Moreover, the Claimants delayed the trial date of the Consolidated S.D. Miss. Actions from October 2006, to March 2007, indicating they were unconcerned about the Debtors' deadline of December 31, 2007.[182]  It is thus disingenuous for the Claimants to contend that they shared the same sense of urgency as the Debtors did in rebuilding

---

at 113:17–114:20, Trial Ex. 37.

[181] See Trial Ex. 61 (describing the Claimants' demands, including a fixed level of catastrophic insurance and the creation of an insurance reserve including an additional four interest payments); Test. of Todd Raziano, Trial Tr. 458:6–463:19; see also supra text p. 33 and note 110.

[182] The Claimants discount the December 31, 2007, deadline by pointing out that in June, 2006, the Debtors projected an opening date for the Resort of July 4, 2007, giving them six months of cushion.  This projected date, however, contemplated use of the Insurance Proceeds as a result of the Comprehensive Rebuild Proposal.

the Resort when they clearly did not. Their outlook may be explained in part by the fact that the Noteholders continued collecting an uninterrupted stream of interest payments from the Insurance Proceeds until repayment of the Notes on August 10, 2007.[183]  Likewise, the Indenture Trustee continued collecting its compensation and expenses, including its attorney's fees, from the Insurance Proceeds and continued doing so even after repayment of the Notes under the Plan.

The Claimants make light of the Debtors' purported cash-flow problems because on the Petition Date the Debtors had access to more than $40 million in financing from Leucadia, through BHR, to move forward with the reconstruction of the Resort.  However, Leucadia and its affiliates already had invested approximately $150 million of unsecured funds into the Resort and had funded all of the pre-petition reconstruction work.[184]

The Claimants next insist that the Debtors at least knew that, given the existing impasse over storm insurance, it was at least foreseeable that the Debtors would repay the Notes in their bankruptcy cases.  They rely on the deposition testimony of O'Connor, who served in the dual roles of vice-president of Leucadia and a member of the Debtors' board of managers.[185]  At his deposition on January 9, 2007, O'Connor testified that prior to the filing of the Debtors' Petitions and in preparation for those filings, discussions took place regarding "the possibility of needing to take the bond holders out," and that consideration was given to structuring a credit facility to be funded post-petition by Leucadia that would allow for litigation over the Claimants' entitlement to the

---

[183] Test. of Joseph O'Connor, Trial Tr. 742:12-23.

[184] Test. of Joseph O'Connor, Trial Tr. 708:9–18; see Preliminary Objection of Majority Holders to Debtors' Motion for Use of Cash Collateral ¶ 35, Trial Ex. 68.

[185] Test. of Joseph O'Connor, Trial Tr. 667:2-10.

prepayment premium.[186]  At the Adversary Trial, however, O'Connor testified that the context of those discussions took place as "what-if" scenarios, and during cross-examination further explained that if the impasse between the Debtors and the Claimants continued regarding storm insurance, "I'm not sure how you exit bankruptcy without – without replacing the bonds in that scenario."[187]

Although Leucadia apparently was aware of the existence of a prepayment premium in the Indenture,[188] the Claimants never proved that avoiding a prepayment premium was a motivating factor that led the Debtors to commence their bankruptcy cases.[189]  Rather, the deposition testimony supported the Debtors' position that the motivation behind the bankruptcy filings was to rebuild the Resort.  As O'Connor stated in his deposition, "Our goal from the bankruptcy is to rebuild the casino.  Our goal is to use the original bond proceeds that are now insurance proceeds to rebuild and reopen. That's the goal of the bankruptcy."[190]  Similarly, he testified at the Adversary Trial, "Premier filed [the Petitions] so that it could access its insurance proceeds to rebuild and reopen."[191]  Likewise, Todd Raziano testified at the Adversary Trial, as follows:

Q: "Premier. What was the basis for the company, Premier's decision, to file Chapter 11?"

A:  "To get the insurance proceeds released that the previous 12, 13 months failed

---

[186] Test. of Joseph O'Connor, Trial Ex. 134, Dep. Tr.114:5-115:18.

[187] Test. of Joseph O'Connor, Trial Tr. at 732:13-733:5.

[188] Test. of Joseph O'Connor, Trial Ex. 134, Dep. Tr. 412:19–413.

[189] Test. of Joseph O'Connor, Trial Ex. 134, Dep. Tr. 414:21–415:3.

[190] Test. of Joseph O'Connor Dep. Tr. 414:24– 415:3.

[191] Test. of Joseph O'Connor, Trial Tr. 690:17–23.

to do."[192]

Also, Billhimer testified at the Adversary Trial, as follows:

Q:  "Why did Premier file its Chapter 11?"

A:  "Really for the sole purpose of gaining access and a more expedient process to rebuild and gain access to the insurance proceeds."[193]

According to the Claimants, however, other evidence offered at the Adversary Trial confirms that the replacement of the Notes was not only foreseen at the time of the bankruptcy filing but was in fact planned and desired.  Such evidence included the tender offers made by BHR.  As discussed previously, Leucadia, through BHR, sought to purchase all of the outstanding Notes at a price of 101% of par through numerous tender offers, including the last one that extended until September 29, 2006, ten days after the bankruptcy filing.  Although the Change of Control offers and the two Event of Loss offers made by the Debtors were required under the Indenture, those made by BHR were not.[194]  The Debtors explained, however, that the BHR tenders offers were companion offers made to ensure that the Insurance Proceeds remained in place.[195]

Finally, the Claimants point to the Debtors' E-mails that show that preparations to replace the Notes began less than a week after the Petition Date[196] and before the Claimants filed any objection

---

[192] Test. of Todd Raziano, Trial Tr. 495:19–22.

[193] Test. of Joseph Billhimer, Trial Tr. 777:5–8.

[194] Indenture § 4.16, at 69-70 of 113, Trial Ex. 1; Test. of Joseph O'Connor, Trial Tr. 727:2-729:5.

[195] Test. of Todd Raziano, Trial Tr. 477:1-13.

[196] Trial Exs. 122 & 123.

to the Debtors' use of cash collateral.[197]   Given the long, torturous history of negotiations between the parties, it would have been foolish for the Debtors not to expect the Claimants to challenge their access to the Insurance Proceeds, which they did, of course.

The Debtors cite In re Public Service Co. of New Hampshire, 114 B.R. 813 (Bankr. D.N.H. 1990), in support of the proposition that a debtor can be "forced to come into the federal bankruptcy court" even where the filing is voluntary, a point this Court has already recognized. Id. at 816.  In that case, the debtor owned an interest in the Seabrook Unit 1 nuclear generating station, which had cost its investors more than $1.7 billion to build.  Unfortunately, the final licensing proceeding for the Seabrook Unit 1 had not been completed, which meant the plant was "producing neither electricity nor income." Id. A state statute  prohibited any public utility from basing rates on construction costs unless the utility was actually providing service to its consumers.  Id. The debtor petitioned the New Hampshire Public Utilities Commission for an emergency rate surcharge anyway, on the ground that the statute was unconstitutional. Shortly after the New Hampshire Supreme Court rejected the debtor's constitutional challenge, the debtor commenced its chapter 11 case.  Id. at 815-16. During the plan confirmation process, an issue arose as to whether bondholders were entitled contractually to premium payments under certain indentures because of the early redemption of the bonds proposed under the plan.  The prepayment premium provisions of the indentures were triggered only if prepayment was at the debtor's "option."  The bankruptcy court found that because the debtor was a "regulated utility whose sole source of income was subject to regulatory decisions," the debtor "was in fact forced to come into the federal bankruptcy court," despite having filed a "voluntary" petition. Id. at 815–16, 819.  For that reason, the bankruptcy court

_____

[197] Trial Exs. 67 & 68.

held that the prepayment of the bonds in the plan "was in no sense an exercise of a voluntary 'option' by the debtor." Id. at 819.

The Debtors liken the situation they faced just before the Petition Date to that faced by the debtor in Public Service Company because their business was not producing any revenue and would not begin to do so until the Resort was rebuilt using the Insurance Proceeds. They argue that just like the debtor in Public Service Company, the Debtors' ability to rebuild was subject to the control of a third party, the Noteholders. The Noteholders, on the other hand, attempt to distinguish Public Service Company because of its unique factual circumstances involving a public utility. Id. at 815-16.

The Court finds the facts in Public Service Company to be sufficiently analogous to lend support for the Debtors' argument that the bankruptcy filings were not willful or intentional within the meaning of § 6.02 of the Indenture. Issues of willfulness and intention often involve elusive factual questions. Not surprisingly, the Claimants did not present any direct evidence at the Adversary Trial that established the Debtors' willfulness or intention to escape the prohibition in the Indenture on the early payment of the Notes. Such evidence rarely ever would be available. The Claimants did, however, produce sufficient circumstantial evidence as to place willfulness and intention at issue. The Debtors, nevertheless, were able at the Adversary Trial to dispel the inference raised by the Claimants by producing evidence that overwhelmingly supported their contention that they filed the Petitions because of their financial need to gain access to the Insurance Proceeds. Ultimately, the burden of proof rested on the Claimants, who in the end did not meet their burden of showing that the Debtors filed the Petitions with the requisite intent so as to entitle the Claimants to a prepayment premium as provided for under § 6.02 of the Indenture.

## 2. The Plan Default

As with the Petition Default, the Claimants argue that the Debtors' consummation of the Plan, providing for redemption of the Notes prior to the end of the No-Call Period in violation of § 3.07 of the Indenture, was both willful and done with the intention of avoiding the prohibition on redemption of the Notes. Thus, the Claimants contend that they are entitled to payment of an additional premium under § 6.02 of the Indenture.

In the Debtors' Post-Trial Brief, the Debtors protest that the consummation of the Plan is not listed as an event of default under § 6.01 of the Indenture and that the Claimants' assertion that the Debtors breached the No-Call Provision in § 3.07 does not make the payment of the Notes an event of default within the meaning of § 6.01. Unless the Plan consummation constituted an event of default, then § 6.02, which provides for payment of a premium under certain circumstances, does not apply. In the Claimants' Supplemental Post-Trial Brief, which the Claimants filed specifically in order to address this argument, the Claimants identified both § 6.01(d) and § 6.01(e) as events of default arising out of the Debtors' breach of § 3.07. However, the Claimants identified only § 6.01(d) in their Amended Answer[198] and did not mention § 6.01(e) in any pleading filed in this Adversary, despite the volume of pleadings filed by the Claimants. See Debtors' Post-Trial Brief at 29-30; Debtors' Supplemental Post-Trial Brief at 5. Moreover, the Claimants did not refer to either § 6.01(d) or § 6.01(e) in the Joint Pre-Trial Order (Adv. Pro. Dkt. 81) signed by the parties' counsel.

As to the Joint Pre-Trial Order, Rule 16(d) of the Federal Rules of Civil Procedure, made

---

[198] Amended Answer ¶ 45 at 22 ("[T]he Debtors redeemed and/or prepaid the outstanding . . . Notes, which constitutes a breach of Section 3.07of the Indenture and an event of default under Section 6.01(d) of the Indenture.").

applicable to bankruptcy proceedings by Rule 7016 of the Federal Rules of Bankruptcy Procedure, provides that a pre-trial order controls the course of the trial and that a court may reject any issue not contained in that order except to prevent manifest injustice. In that regard, the Fifth Circuit has held on numerous occasions that a joint pre-trial order supercedes all previously filed pleadings. See Elvis Presley Enter., Inc. v. Capece, 141 F.3d 188, 206 (5th Cir. 1998); see also Bayou Louie Farm, Inc. v. White (In re Heigle), 401 B.R. 752, 765-66 (Bankr. S.D. Miss. 2008). Here, although the issue regarding the effect of the alleged breach of the No-Call Provision of the Indenture was well known to the parties at the time of the Adversary Trial, the particular provision of the Indenture that the Claimants relied upon to establish their claim for damages was not. Still, in the interest of fairness, the Court will consider whether § 6.01(d) provides a remedy. Although the Claimants did not identify that provision in the Joint Pre-Trial Order, they cited § 6.01(d) in their Amended Answer. On the other hand, this Court will not consider any claim under § 6.01(e) because the Claimants identified that provision for the first time in the Claimants' Supplemental Post-Trial Brief.[199]

### a. Event of Default: § 6.01(d)

Section 6.01(d) provided that the following constituted an Event of Default:

> Premier . . . fails to observe, perform or comply with any other covenant, representation, warranty or other agreement in this indenture or the Notes not set forth in clause (c) above for 60 days.[200]

---

[199] Section 6.01(e) provided generally that if the Debtors defaulted under any mortgage, indenture or other indebtedness, such default constituted an event of default under the Indenture. Although the Claimants contend that this provision pertained to defaults of the Indenture itself, it is clear that § 6.01(e) was a cross-default provision that applied to defaults only under other collateral agreements.

[200] Indenture § 6.01(d), Trial Ex. 1.

The Claimants contend that by paying the Notes on August 10, 2007, as contemplated in the Plan, the Debtors failed to comply with their agreement in the Indenture that the Notes "will not be redeemable at the Issuer's option prior to February 1, 2008" and that their failure to comply with § 3.07 continued for 60 days. The 60-day grace period in § 6.01(d) suggests that this provision of the Indenture was intended to apply only to *minor* breaches of the Indenture that the Debtors could readily remedy. Obviously, § 3.07 does not fit neatly within this provision. As the Debtors observed in the Debtors' Supplemental Post-Trial Brief, the substantial consummation of the Plan resulted in the simultaneous cancellation of the Indenture.[201] Therefore, no alleged default of the Indenture that occurred as a result of the repayment of the Notes could have continued while the Indenture was still in effect for any relevant period of time, let alone for 60 days as required by § 6.01(d).

Assuming for the sake of argument that a breach of § 3.07 qualified as an event of default under § 6.01(d), the Debtors make the additional argument that the filing of the bankruptcy case resulted in the automatic acceleration of the Notes under the Indenture and thus the Notes were mature when the Debtors repaid them as part of the consummation of the Plan. Section 6.01(j) defined the commencement of a "voluntary case" under "the Bankruptcy Law" as an event of default.[202] Section 6.02 of the Indenture, entitled "Acceleration," stated: "In the case of an Event of Default specified in clause (j) . . . of § 6.01 hereof, with respect to Premier . . . all outstanding Notes will become due

---

[201] Except with respect to the rights of the Indenture Trustee relating to the Disputed Liquidated Damages Claim, the Plan cancelled the Indenture as of its effective date. <u>See</u> Plan § 5.2.

[202] Indenture § 6.01, Trial Ex. 1.

and payable immediately without further action or notice."[203]  As mentioned previously, the parties

agree that an event of default occurred on September 19, 2006, as a result of the filing of the

Petitions by the Debtors.  They disagree, however, as to whether the maturity date of the Notes

accelerated "immediately without further action or notice" by the Claimants on the Petition Date.

If so, then because the Debtors did not pay the Notes until August 10, 2007, when the Plan was

consummated, the payment took place well after the Notes had already matured, but not before.  See

In re LHD Realty Corp., 726 F.2d 327 (7th Cir. 1984) (Upon acceleration, the maturity date of a debt

is advanced, so "that payment [made] thereafter is not [a] prepayment but instead is [a] payment

made after maturity.").  The parties agree that the Claimants never rescinded any alleged automatic

acceleration[204] although they could have done so under § 6.02.[205]

   The Claimants challenge the Debtors' acceleration argument for two reasons.  First, they contend

that under New York law, the acceleration provision in § 6.02 of the Indenture is not self-operative.

Second, they contend that Judge Gaines had already found, in denying the DIP Financing Motion,

---

[203] Indenture § 6.02, Trial Ex. 1.

[204] See Test. of Christopher Kearns, Trial Tr. 275:3–10 (Q: "[W]as any acceleration of the Premier notes ever rescinded by the noteholders [or] the indenture trustee in the Premier case, to the best of your knowledge?" . . . A: "-- the answer is no.").

[205] Section 6.02 provides, in relevant part:

> The Holders of a majority in aggregate principal amount of the then outstanding Notes by written notice to the Trustee may, on behalf of all of the Holders, rescind an acceleration or waive any existing Default or Event of Default and its consequences if the rescission would not conflict with any judgment or decree and if all existing Events of Default (except nonpayment of principal, interest or premium or Liquidated Damages, if any, that has become due solely because of the acceleration) have been cured or waived.

Indenture § 6.02, Trial Ex. 1.

that the Indenture prohibited early repayment of the Notes and that under the principle of collateral estoppel, the Debtors cannot re-litigate that finding.   The Court will address these two challenges in turn.

### b.  Automatic Acceleration

The starting point in analyzing any contract, including the Indenture at issue here, is the language of the agreement itself. See Stroll v. Epstein, 818 F. Supp. 640, 643 (S.D.N.Y.), aff'd, 9 F.3d 1537 (2d Cir. 1993) ("Under New York law, ... the Court must look first to the parties' written agreement to determine the parties' intent and [must] limit its inquiry to the words of the agreement itself if the agreement sets forth the parties' intent clearly and unambiguously."). Under New York law, courts must construe a contract in a manner that avoids inconsistencies and reasonably harmonizes its terms.  See James v. Jamie Towers Hous. Co., 294 A.D.2d 268, 269 (N.Y. App. Div. 2002); Barrow v. Lawrence United Corp., 146 A.D.2d 15, 18 (N.Y. App. Div. 1989) ("Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms."). The fundamental precept of contract interpretation is that agreements are construed in accord with the parties' intent. See Slatt v. Slatt, 64 N.Y.2d 966, 967 (N.Y. 1985) ("The best evidence of what parties to a written agreement intend is what they say in their writing."); Slamow v. Del Col, 79 N.Y.2d 1016, 1018 (N.Y. 1992). Thus, a written agreement that is complete, clear, and unambiguous[206] on its face must be enforced according to the plain meaning of its terms.  See, e.g., R/S Assocs. v. N.Y. Job Dev. Auth., 98 N.Y.2d 29, 33 (N.Y. 2002);  Nuclear Facilities, Inc. v.

---

[206] A contract is unambiguous if the language it uses has "a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion."  Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 355 (N.Y. 1978).

Advance Relocation & Storage, Inc., 173 A.D.2d 802, 803 (N.Y. App. Div. 1991) ("Where the language of a contract is clear and unambiguous, its plain meaning should govern its interpretation.").

Here, the Indenture clearly stated that the Notes accelerated immediately and without further action or notice. The effect of the acceleration was to change the maturity date from February 1, 2012, to the Petition Date, which then became the new maturity date. See Black's Law Dictionary 12 (9th ed. 2009) (defining acceleration as the "advancing of a loan agreement's maturity date so that payment of the entire debt is due immediately."). It is undisputed that the Indenture does not include language that expressly preserves the right of the Noteholders to collect a premium after acceleration or that requires payment of a premium during the No-Call Period. Yet, in Northwestern Mutual Life Ins. Co. v. Uniondale Realty Assocs., 816 N.Y.S.2d 831, 836 (N.Y. Sup. Ct. 2006), the trial court, applying New York law, held that prepayment penalties are not allowed when a loan is paid *after* default and acceleration "unless clear contract language requires it." Therefore, the absence of any such provision in the Indenture authorizing payment of a premium means that the Claimants are not entitled to a prepayment premium as an allowed secured claim. 11 U.S.C. § 506(b). In the Claimants' Supplemental Post-Trial Brief, the Claimants attempt to distinguish Northwestern Mutual on the ground that it involved a foreclosure action commenced by the lender. The court in Northwestern Mutual, however, did not limit its thoughtful analysis of the historical development of commercial prepayment clauses to any specific factual scenario.

In further support of their position that under New York law automatic acceleration provisions are not self-operative, the Claimants rely on a case decided almost half a century ago, Tymon v. Wolitzer, 240 N.Y.S.2d 888 (N.Y. Sup. Ct.1963). There, the trial court held that a provision under which a debt became immediately due and payable was not self-operative but "could be brought into

being only by an election to accelerate affirmatively exercised by the plaintiff obligees," with such election to be "evidenced by some unequivocal overt act evidencing the election to accelerate or by the institution of a lawsuit on the obligation as accelerated." Id. at 896.

The Tymon court, however, did not foreclose the ability of parties to draft acceleration provisions that would be self-operative. The clause at issue in Tymon read as follows:

> [The] omission or failure of the Pledgor to comply with any of the items referred to in the preceding paragraph numbered '15' shall constitute a default under the terms of this agreement and pledge and/or promissory notes and the remaining unpaid balance due thereon shall immediately become due and payable . . . without notice to the Pledgor except the five days notice of sale of said stock at public or private sale as hereinbefore expressed.

Tymon, 240 N.Y.S.2d at 893. The Tymon court established a rule of construction for similar acceleration clauses, but not a general prohibition on all self-operative acceleration clauses. See Tymon, 240 N.Y.S.2d at 895–96; see also 1 Mortgages and Mortgage Foreclosure in New York § 28:6 (2009) ("If so specifically written, it is possible for an acceleration clause to be self-executing."). Such rules are simply meant to fill gaps in incomplete contracts and only govern if parties do not contract around them. Ian Ayres & Robert Gertner, Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules, 99 Yale L.J. 87 (Oct. 1989). This principle is noted in the same treatise cited by the Claimants: "This material is by no means complete because in any particular case special covenants may be used.  After all, the covenants are the expression of the particular contractual agreement between the parties." American Bar Foundation Corporate Debt Financing Project, Commentaries on Model Debenture Indenture Provisions 469 (1971).[207] Here, the

---

[207] Federal courts have approved of the Commentaries as a source of guidance in interpreting bond provisions.  See, e.g., Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 139 (2d Cir. 2005) ("Helpful guidance [interpreting bond indenture provisions] is found in the American Bar Foundation's Commentaries on Model Debenture Provisions.").

parties contracted around the ruling in <u>Tymon</u> with the express intention of making the acceleration clause in the Indenture self-operative in the event that the Debtors filed a voluntary petition for relief under the Bankruptcy Code.  Apparently, they did so because the self-operative nature of § 6.02 served an important purpose: It allowed the contractual acceleration of the Notes without the Indenture Trustee having to give the Debtors notice of acceleration post-petition, which would have required the Indenture Trustee to seek intervention from this Court to lift the automatic stay. <u>See</u> 11 U.S.C. § 362; <u>In re Solutia, Inc.</u>, 379 B.R. 473, 484 (Bankr. S.D.N.Y. 2007) ("It was entirely appropriate to provide for automatic acceleration in the Original Indenture since the giving of a notice of acceleration post-petition would violate the automatic stay.").  Placing the Debtors immediately in default upon the filing of a bankruptcy petition was perhaps the best alternative to a provision that outright waived the Debtors' right to commence a bankruptcy case, a provision that would have been unenforceable for public policy reasons.  <u>See</u> <u>Fallick v. Kehr</u>, 369 F.2d 899, 904 (2d Cir. 1966) (advance agreements to waive the benefits of bankruptcy are void); <u>In re Shady Grove Tech Ctr. Assocs. Ltd. Partnership</u>, 216 B.R. 386, 390 (Bankr. D. Md. 1998) (prohibitions against the filing of a bankruptcy case are unenforceable); <u>In re Gulf Beach Dev. Corp</u>. 48 B.R. 40, 43 (Bankr. M.D. Fla. 1985) (debtor cannot be precluded from exercising its right to file bankruptcy).

<u>Tymon</u> is also distinguishable because the policy concerns in that case are not present here. The <u>Tymon</u> court reasoned that holding acceleration clauses to be self-operative would be unfair to lenders because it would enable a debtor to commit an intentional default for the purpose of forcing the lender to accept immediate repayment whenever market conditions rendered the loan unfavorable. <u>Id.</u> at 896.  Because the acceleration clause in <u>Tymon</u> provided for automatic acceleration upon *any* default, a borrower could exploit this provision by simply foregoing an interest payment. <u>Tymon</u>, 240

N.Y.S.2d at 893–96. By contrast, § 6.02 of the Indenture at issue here called for automatic acceleration only if the Debtors found themselves in bankruptcy, whether voluntary or involuntary. As to all other events of default, § 6.02 called for permissive, rather than automatic, acceleration depending on whether the Indenture Trustee or the Noteholders declared the Notes accelerated. It would not be necessary to distinguish defaults by bankruptcy from defaults by other means if the parties did not intend for acceleration to take place automatically in some instances. Because the Indenture's acceleration clause contained this specific, bargained-for exception, Tymon's construction rule that automatic acceleration clauses are not self-operative does not apply. To hold otherwise would contravene well-settled cannons of contract interpretation: (1) that a contract should be interpreted "to give effect to all of its provisions;" and (2) that a contract must not be construed in a way that "would render a contractual provision meaningless or without force or effect." God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP, 845 N.E.2d 1265, 1267 (N.Y. 2006); Ronnen v. Ajax Elec. Motor Corp., 671 N.E.2d 534, 536 (N.Y. 1996).

More recently, under circumstances very similar to those in this proceeding, the bankruptcy court in Solutia found that an automatic acceleration provision was self-operative and, therefore, disallowed the noteholders' claims for prepayment penalties. Solutia, 379 B.R. at 478. The indenture in Solutia contained an almost identical acceleration clause that declared that the notes "shall become immediately due and payable without any declaration or other act on the part of the Trustee or any Holder" upon the filing of a case for reorganization under any applicable law. Id. All other defaults required an action by a specified percentage of noteholders and the giving of notice to effectuate acceleration. Id. After the debtor in Solutia filed for chapter 11 protection, the noteholders sought damages because the debtor's repayment of the notes under the plan of reorganization prior to the

maturity date stated in the indenture deprived them of an uninterrupted payment stream. Id.  The court recognized that under New York law a borrower may not prepay an instrument absent a prepayment clause, based on a policy that the "mortgagee has bargained for a stream of income over a fixed period of time." Id. at 488.  However, the court in Solutia held that the noteholders expressly gave up their expectation of a stream of future income in favor of an immediate right to collect their entire debt when they agreed to an automatic acceleration clause in the indenture. Id. at 478. Accordingly, that court disallowed the noteholders' claim for prepayment penalties. Id.

The Claimants contend that the bankruptcy judge in Solutia misinterpreted  New York law and criticize the decision for failing to distinguish the decision of the New York state court in Tymon. In contrast to Solutia, the Claimants rely on an earlier case also rendered by the bankruptcy court for the Southern District of New York, but by a different judge, in In re Calpine Corp. (CalGen), 365 B.R. 392 (Bankr. S.D.N.Y. 2007).  There, each of the indentures at issue contained no-call provisions and none of them included a premium for repayment prior to the end of the no-call period.  For that reason, the CalGen Court described them as "antiquated" and "Model T" indentures.  The indentures also provided that a bankruptcy filing by CalGen constituted an event of default resulting in an automatic acceleration of debt.  The bankruptcy court found that the debt had been accelerated by virtue of CalGens' bankruptcy filing and thus was due and payable immediately. Id. at 398 & n.7. The Claimants point out that notwithstanding the automatic acceleration, the court awarded CalGen's lenders a claim for damages for breach of the agreements.  Id. at 399.  What the Claimants fail to point out is that the court awarded them an unsecured claim.  The bankruptcy court did not grant the lenders an allowed secured claim under § 506 because of the absence of a premium provision in any

of the indentures.[208]   Thus, <u>CalGen</u> does not conflict with the decision in <u>Solutia</u>, insofar as its

application of § 506 is concerned.

Next, the Claimants rely on the decision on appeal to the District Court for the Southern District

of New York in <u>In re Calpine Corp.</u>, No. 05-60200 (BRL), 2007 WL 4326738, at *9 (S.D.N.Y. Nov.

21, 2007), in support of their position that <u>Solutia</u> was wrongly decided.   The issue in <u>Calpine</u> did

not involve no-call provisions but rather conversion rights under an indenture that the court held had

expired as the result of a filing of the bankruptcy petition and the automatic acceleration of the

maturity date.   In reaching its decision, the district court distinguished the no-call provisions at issue

in <u>CalGen</u> from the conversion rights at issue in <u>Calpine</u>:

> It is clear that the <u>CalGen</u> decision is distinguishable from this appeal.   First, the
> contested claims in <u>CalGen</u> involved no-call provisions rather than conversion rights.
> Furthermore, the Bankruptcy Judge found that under the <u>CalGen</u> agreements the
> noteholders had an expectation of an uninterrupted payment stream and that early
> repayment constituted a breach for which the noteholders were entitled to damages.
> Under the Indentures in this case, the conversion rights expired as a result of the
> filing of the Petitions. Therefore, unlike in <u>CalGen</u>, there was no breach of the
> Indentures and the Noteholders suffered no "dashed expectation" damages as a result
> of acceleration.

<u>Id.</u> at *11.   The Claimants contend that the decisions in <u>CalGen</u> and <u>Calpine</u> are consistent with

<u>Tymon</u> but fail to demonstrate how.   Neither <u>CalGen</u> nor <u>Calpine</u> cites <u>Tymon</u>, or holds that New

York law prohibits acceleration provisions from operating automatically.

Citing <u>LHD Realty Corp.</u>, 726 F.2d at 332, <u>Sharon Steel Corp. v. Chase Manhattan Bank, NA</u>,

691 F.2d 1039, 1053 (2d Cir.1982), and <u>In re Skyler Ridge</u>, 80 B.R. 500, 507 (Bankr. C.D. Cal.

1987), the Claimants argue that any automatic acceleration of a debt that occurs upon the filing of

---

[208] Whether the Claimants likewise have an unsecured claim for damages is addressed
later in this opinion. <u>See</u> <u>infra</u> subsection D.

a bankruptcy case does not eliminate the right to a prepayment premium unless it is accompanied by an affirmative act by the lender seeking prepayment of the debt. The Claimants' argument, however, fails to note the distinction between an automatic acceleration effectuated by the Bankruptcy Code and an automatic acceleration effectuated by a contractual provision. The automatic acceleration of a debt under the Bankruptcy Code allows a lender to file a proof of claim for the unmatured principal amount of the debt under § 502 without violating the automatic stay, but such acceleration is relatively limited and does not change the maturity date of the debt. See In re Manville Forest Prods. Corp., 43 B.R. 293, 298 (S.D.N.Y. 1984) (Bankruptcy operates to automatically accelerate the principal amount of all claims against the debtor because of the "expansive [Bankruptcy] Code definition of 'claim' [pursuant to 11 U.S.C. §101(4)(A)], which allows any claim to be asserted against the debtor . . . and from the Code's provision in Section 502 that a claim will be allowed in bankruptcy regardless of its contingent or unmatured status."), aff'd in part & rev'd in part on other grounds sub nom Official Comm. of Unsecured Creditors v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.), 60 B.R. 403 (S.D.N.Y. 1986); accord Skyler Ridge, 80 B.R. at 507.

On the other hand, a contractual acceleration provision, like the one at issue here, goes beyond allowing a creditor to file a claim for unmatured principal and actually advances the maturity date of the debt. See Solutia, 379 B.R. at 488; Calpine, 2007 WL 4326738 at *9. The cases that the Claimants cite involved the former kind of acceleration which does not defeat a lender's claim for a prepayment premium unless the lender waives it by engaging in affirmative acts to collect the debt prior to its maturity. For example, the United States Court of Appeals for the Seventh Circuit held in LHD Realty Corp. that, so long as the lender refrains from taking overt action, any acceleration triggered by bankruptcy will not defeat the right to a prepayment premium:

> [I]f the lender wishes to preserve its right to a premium, it must forbear from exercising its acceleration option and await the trustee's or the debtor's decision. Should the trustee or the debtor then decide to repay the loan, the lender would presumably be able to enforce an otherwise valid prepayment premium.

LHD Realty Corp., 726 F.2d at 332. Thus, whether the Claimants ever engaged in any overt, affirmative acts to accelerate the Notes is irrelevant. Moreover, whether the acceleration that occurred as a result of the bankruptcy filing was "conditional" in nature because the Debtors could have decelerated the Indenture under the Plan and reinstated the Notes pursuant to § 1124 of the Bankruptcy Code also is irrelevant.

In summary, automatic acceleration clauses are self-operative under New York law when they provide for acceleration without notice upon an event of default by bankruptcy. See Calpine, 2007 WL 4326738 at *9 ("A fair reading of the Indentures . . . indicates that 'Maturity,' consistent with general understanding, occurred when the Notes became 'due and payable' by virtue of automatic acceleration upon the Debtors' bankruptcy filing."); see also CalGen, 365 B.R. at 398 ("In addition, each of the [indentures] provides that a bankruptcy filing by CalGen is an event of default resulting in an automatic acceleration of debt. As such, the [debt] has been accelerated by virtue of the Debtors' bankruptcy filing and thus is 'due and payable immediately.'"); accord Solutia, 379 B.R. at 484 ("There can be no dispute that the 2009 Note Indenture provides for automatic acceleration upon filing of a petition for reorganization. Upon acceleration the entire debt becomes due and owing."). The reason these clauses exist is to allow lenders to accelerate the debt without first having to petition the bankruptcy court to lift the automatic stay. Solutia, 379 B.R. at 484 ("It was entirely appropriate to provide for automatic acceleration in the Original Indenture since the giving of a notice of acceleration postpetition would violate the automatic stay."). Contractual acceleration provisions are only limited in what they can do by the parties' imaginations—in the absence of

fraudulent, exploitive, overreaching, or unconscionable conduct. <u>See, e.g.</u>, <u>Fifty States Mgt. Corp.</u> <u>v. Pioneer Auto Parks, Inc.</u>, 46 N.Y.2d 573, 577 (N.Y. 1979) ("[A]greements providing for the acceleration of the entire debt upon the default of the obligor . . . [i]n the vast majority of instances . . . have been enforced at law in accordance with their terms.").

Just like the noteholders in <u>Solutia</u>, by investing under the Indenture, which included an automatic acceleration provision, the Claimants gave up their expectation to a payment stream in the future. The Claimants chose to forego any prepayment premium in favor of an immediate right to collect their entire debt after a bankruptcy event of default. The parties to the Indenture are sophisticated investors who bargained for the risks and benefits of this undertaking of considerable size.  Simply put, the Indenture itself did not provide the Claimants a premium or liquidated damages in the event of a bankruptcy default.[209]

### c. Collateral Estoppel–The DIP Financing Opinion

The Claimants maintain that certain findings made in the DIP Financing Opinion by Judge Gaines, before whom this case was pending at that time,[210] collaterally estop the Debtors from re-litigating their entitlement to the prepayment premium.  Judge Gaines, in a written opinion denying the DIP Financing Motion, found that "[u]nder the indenture now before the court in this case, there is no right to prepay the notes until February 1, 2008," and also that "the payment the Debtors seek authorization to make would impair or modify rights under the indenture and loan document." <u>See</u> DIP Financing Opinion at 9-10.  The Claimants contend that under the doctrine of collateral estoppel, the Debtors cannot now challenge these findings.  The Claimants did not raise this issue

---

[209] Whether the absence of a damages provision for repayment of the Note during the No-Call Period forecloses <i>any</i> recovery by the Claimants is discussed below in subsection D.

[210] <u>See</u> <u>supra</u> note 3.

before Judge Gaines at the confirmation hearing when they opposed repayment of the Notes under the Plan, but they did include it as an affirmative defense in their Amended Answer.

Collateral estoppel is only one of several inter-related doctrines regarding the finality of judgments. In general, collateral estoppel prohibits re-litigation of issues fully and vigorously litigated and necessarily decided in a previous suit between the same parties.[211]   Kaspar Wire Works, Inc. v. Leco Eng'g & Machine, Inc., 575 F.2d 530, 535-36 (5th Cir. 1978).  In order for collateral estoppel to apply, the Claimants had to establish the following four elements: (1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is no special circumstance that would make it unfair to apply the doctrine. United States v. Shanbaum, 10 F.3d 305, 311 (5th Cir. 1994). When the DIP Financing Opinion is read as a whole, it is clear that Judge Gaines did not intend to foreclose litigation of the prepayment issue:

> Debtors' counsel offered the recent case of Law Debenture Trust Company of New York v. Calpine Corporation (In re Calpine Corporation), 2007 WL 57879 (S.D.N.Y. Jan. 9, 2007), in support of the Debtors' request for authorization to prepay the notes through utilization of the motion for post-petition financing.  That court authorized notes to be prepaid from debtor-in-possession financing outside the context chapter

---

[211] It is not clear that the issue raised by the Claimants presents questions about the doctrine of collateral estoppel rather than the doctrine of law of the case.  The Claimants contend that the Debtors are barred from re-litigating in this Adversary an issue that was resolved previously in the main bankruptcy case.  Yet, this Adversary is a component of the Debtors' bankruptcy case, and, as noted above, collateral estoppel requires for its application prior litigation in *another* proceeding. Copeland v. Merrill Lynch & Co., 47 F.3d 1415, 1421-22 (5th Cir. 1995).  The doctrine of law of the case, in contrast, is a rule of practice  involving the same issue in the same case.  Morrow v. Dillard, 580 F.2d 1284 (5th Cir. 1978).  Because neither one of the parties asked this Court to apply principles of law of the case, rather than collateral estoppel, this Court will accept their characterization of Judge Gaines' decision without deciding whether it is the proper approach.

11 plan confirmation. A critical distinction with that case, however, is that the loan document there entitled the debtor to prepay and there were no objections to the prepayment of the principal by the lenders of the indenture trustee. The dispute dealt only with whether the prepayment should include a make-whole premium. *Under the indenture now before the court in this case, there is no right to prepay the notes until February 1, 2008.*[212]

Thus, Judge Gaines was merely comparing provisions of the Indenture in this case with the one in Calpine, rather than prohibiting repayment of the Notes.[213]  Likewise, the larger context of the second excerpt quoted by the Claimants indicates that the prepayment issue was not finally resolved in the DIP Financing Opinion:

> *Under the circumstances of this particular case, where the payment the Debtors seek authorization to make would impair or modify rights under the indenture and loan documents and where the noteholders and indenture trustee strongly object to the payment*, the court concludes that the appropriate course of action, and the one that would better protect the rights of all the parties and the estate, would be to allow the case to proceed to the confirmation process and the statutory scheme set out under the provisions of Chapter 11. Based on the arguments and authorities outlined above, the court concludes that the Debtors' Motion for Authorization to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) should be denied.[214]

Judge Gaines' ruling addressed whether the Debtors could pay the Notes under the auspices of a motion filed under § 364 of the Bankruptcy Code. That issue is far from identical to the one presented in this Adversary.  In addition, it can hardly be said that the issue of whether the Debtors could repay the Notes under a plan of reorganization was litigated at the hearing when the DIP Financing Opinion makes clear that, in denying the DIP Financing Motion, Judge Gaines intended

---

[212] DIP Financing Opinion at 9, Trial Ex. 136 (emphasis added denotes the portion quoted by the Claimants).

[213] No-call provisions that purport to prohibit repayment of debt are unenforceable in bankruptcy.  See CalGen, 365 B.R. at 397.

[214] DIP Financing Opinion at 10-11, Trial Ex. 136 (emphasis added denotes the portion quoted by the Claimants).

to "allow the case to proceed to the confirmation process."[215]   The very fact that by virtue of his confirmation of the Plan, Judge Gaines contemplated that this Adversary would take place for the purpose of determining the amount, if any, of the Disputed Liquidated Damages Escrow to which the Claimants were entitled, makes application of the doctrine of collateral estoppel to the prepayment issue both unfair and contrary to common sense.  If Judge Gaines had thought that the prepayment issue had been determined previously at the hearing on the DIP Financing Motion, why did he rule as he did in the Confirmation Opinion?  His Confirmation Opinion recognizes only that specific performance of the No-Call Provision was not an appropriate remedy for its proposed breach.

In summary, this Court finds that with respect to the filing of the Petitions, the Claimants failed to establish that the Debtors acted willfully or intentionally to avoid the prohibition on prepayment of the Notes.  With respect to the Plan itself, the Claimants likewise failed to establish that the payment of the Notes constituted an event of default.  Because the Claimants failed to establish their contractual right to the premium based on either a Petition Default or a Plan Default under § 6.02 of the Indenture, they failed to satisfy the provisions of § 502(b)(1).  Their failure to satisfy § 502(b)(1) forecloses any secured claim under § 506(b) and renders it unnecessary for this Court to consider whether the premium constitutes a reasonable charge under federal law.

## D.  Allowed Unsecured Claim under § 502(b)

Even though the Debtors do not owe the Noteholders a premium under § 6.02 of the Indenture as a secured claim, the Claimants contend, in the alternative, that the Noteholders are entitled to allowance of an unsecured claim for damages incurred as a result of the Debtors' breach of § 3.07

---

[215] DIP Financing Opinion, Trial Ex. 136, at 10.

of the Indenture's No-Call Provision. This is so, according to the Claimants, because the Debtors were solvent and as creditors of a solvent debtor, the Noteholders are entitled, under § 502(b), to damages for breach of their pre-petition contractual rights under applicable non-bankruptcy law.

### 1. The Noteholders' Contractual Rights

The Debtors complain, as a preliminary matter, that the Noteholders have no contractual rights under the Indenture because no-call provisions are unenforceable in bankruptcy cases. CalGen, 365 B.R. at 397 ("no-call provisions that purport to prohibit optional repayment of debt are unenforceable in chapter 11 cases. The 'essence of bankruptcy reorganization is to restructure debt . . . and adjust debtor-creditor relationships.' It would violate the purpose behind the Bankruptcy Code to deny a debtor the ability to reorganize because a creditor has contractually forbidden it.") (quotations & citations omitted); see Cont'l Sec. Corp. v. Shenandoah Nursing Home P'ship, 193 B.R. 769, 774 (W.D. Va. 1996) (affirming bankruptcy court's holding that "[w]hile there is a prepayment prohibition, [it] is not enforceable in this [chapter 11] context "), aff'd, In re Shenandoah Nursing Home P'ship, 104 F.3d 359 (4th Cir. 1996); In re 360 Inns, Ltd., 76 B.R. 573, 575–76 (Bankr. N.D. Tex. 1987) (authorizing repayment of a note despite ten-year prohibition on repayment). The Debtors point out that this Court acknowledged in its Confirmation Opinion that no-call provisions that purport to prohibit the optional repayment of debt are unenforceable in chapter 11 cases.[216] Indeed, the fact that the Plan did not enforce the No-Call Provision but instead provided for repayment of the Notes makes this point rather self-evident. However, the non-breaching party is not deprived of a monetary remedy just because no-call provisions are not subject to the remedy of specific performance in bankruptcy cases, notwithstanding the Debtors'

---

[216] See Confirmation Opinion, at 19 n.25, Trial Ex. 25.

unsupported assertions to the contrary.  See Glendale Fed. Bank, FSB v. United States, 239 F.3d

1374, 1380 (Fed. Cir. 2001) (one way the law makes the non-breaching party whole is by giving him

expectancy damages, which are often equated with lost profits).  Indentures are no different from

other contracts in that regard.

## 2.  Prepayment of the Notes

The Debtors next engage in an exercise in semantics by arguing that they did not "prepay" the

Notes but "satisfied" the Noteholders' allowed claims under the Plan pursuant to §1129, thereby

nullifying any damages claim for early repayment. They assert that the primary function of

bankruptcy law is "to secure a prompt and effectual administration and settlement of the estate of

all bankrupts within a limited period." In re Christy, 44 U.S. 292, 312 (1845). To this end, by its

very nature, a bankruptcy court is called upon to adjudicate, to varying degrees, the claims of

creditors.[217]  Moreover, as a matter of hornbook law, a chapter 11 debtor satisfies the claims of its

creditors under a plan of reorganization. See generally 8 Collier on Bankruptcy ¶ 1141 (16th ed.

2010); see also 11 U.S.C. §1129.  Thus, according to the Debtors, because the claims of the

Noteholders were satisfied in full under the Plan, they cannot be re-litigated in this Adversary.

---

[217]  "Claim" is a statutory defined term. See 11 U.S.C. § 101(5). Under §101(5), a "claim"
means--

> (A) right to payment, whether or not such right is reduced to judgment,
> liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,
> undisputed, legal, equitable, secured, or unsecured; or

> (B) right to an equitable remedy for breach of performance if such breach gives
> rise to a right to payment, whether or not such right to an equitable remedy is
> reduced to judgment, fixed, contingent, matured, unmatured, disputed,
> undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

This Court does not disagree with the Debtors' general pronouncements of the law. However, allowing the Debtors to repay the Notes early under the Plan did not foreclose the issue as to whether the Claimants are entitled to damages. Section 1123(b) specifically authorizes the post-confirmation pursuit of a claim for damages, and the Plan specifically contemplated the litigation of this Adversary and provided for retention of this Court's jurisdiction for that purpose.[218] If prepayment of the Notes upon confirmation of the Plan eliminated the claims asserted in this Adversary, those provisions of the Plan would be rendered superfluous. See Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800 (9th Cir. 1994).

### 3. The Absence of a Contractual Damages Provision

Next, the Debtors maintain that this Court should not award contractual damages to the Claimants because the Indenture did not contain a provision awarding the Claimants any such expectation damages. The Debtors rely upon In re Vest Assocs., 217 B.R. 696, 699 (Bankr. S.D.N.Y. 1998), for its holding that a bankruptcy court cannot "read into a contract damage provisions which the parties themselves have failed to insert regarding the liquidation or calculation of damages arising out of the prepayment of a loan." Id. That case, however, turned on the mandate in § 506 that a secured claim include only those reasonable fees, costs, or charges *provided for under the agreement* under which such claim arose. 11 U.S.C. § 506. This Court has already found that the Claimants do not have a secured claim under § 506. The Court in Vest Associates did not address the possibility of an *unsecured* claim under § 502, perhaps because the solvency of the

---

[218] Under § 4.5 and § 4.6 of the Plan, the Noteholders are to receive the amount, if any, of the Disputed Liquidated Damages Escrow to which they are entitled after resolution of the Disputed Liquidated Damages Claims by Final Order, including court-approved settlement. Plan § § 4.5, 4.6. Under § 12, this Court retained exclusive jurisdiction to determine litigation with respect to the Disputed Liquidated Damages Claims. Plan § 12(b).

debtor was not known at that time.

Moreover,  the Debtors ignore CalGen, in which the bankruptcy court held that, despite the absence of any provision in the Indenture requiring payment of a premium upon repayment during the no-call period, the claimants' "expectation of an uninterrupted payment stream has been dashed giving rise to damages . . . ." CalGen, 365 B.R. at 399.  Instead, they cite to Solutia, in which the bankruptcy court expressed disagreement with CalGen because "it reads into agreements between sophisticated parties provisions that are not there." Solutia, 379 B.R. at 484 n.7.  But where, as in CalGen and here, a borrower violates an explicit prohibition against prepayment, monetary damages are frequently a remedy.  That legal principle was confirmed by the district court in Calpine, which did not question the bankruptcy court's holding that "under the CalGen agreements the noteholders had an expectation of an uninterrupted payment stream and that early repayment constituted a breach for which the noteholders were entitled to damages," but rather distinguished CalGen as a case involving breach of a no-call provision rather than expiration of conversion rights.  Calpine, 2007 WL 4326738, at *11.  Solutia is distinguishable from the facts of this case because the Indenture at issue here expressly says that "[a]ll remedies are cumulative to the extent permitted by law,"[219] thereby reflecting the agreement of the parties that common law damages are an available remedy for breach of the No-Call Provision.

In sum, the unavailability of specific performance as a remedy and the lack of a stipulated liquidated damages provision in the Indenture do not prohibit the allowance of an award of expectation damages to the Claimants as an alternative remedy for breach of the No-Call Provision, as an unsecured claim.  At the time of contract formation, the Claimants contemplated performance

_____

[219] Indenture § 6.03, at 80 at 113, Trial Ex. 1.

of the Indenture, including the No-Call Provision.

### 4. The Solvent Debtor's Contractual Obligations

The Claimants and the Debtors agree that when a debtor is solvent, bankruptcy courts generally will enforce the debtor's contractual obligations to the extent they are valid under applicable state law. In those bankruptcy cases involving solvent debtors, "the task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights." In re Chicago, Milwaukee, St. Paul & Pac. RR, 791 F.2d 524, 528 (7th Cir. 1986); see, e.g., Welzel v. Advocate Realty Invs., LLC (In re Welzel), 275 F.3d 1308, 1318 (11th Cir. 2001); In re 139-141 Owners Corp., 306 B.R. 763, 772-73 (Bankr. S.D.N.Y. 2004). In synthesizing the long line of cases involving both secured and unsecured creditors of solvent debtors, the Sixth Circuit in Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.), 456 F.3d 668, 678-79 (6th Cir. 2006), cert. denied, 127 S. Ct. 1874 (2007), observed that "in solvent debtor cases, rather than considering equitable principles, courts have generally confined themselves to determining and enforcing whatever pre-petition rights a given creditor has against the debtor." Dow Corning, 456 F.3d at 679. The Sixth Circuit offered the following reasoning:

> Based on this application of the absolute priority rule in solvent debtor cases, Class 4 argues that we should enforce their rights under the contract, including their right to interest awarded at the default rate as set forth in the terms of their contract. To do otherwise (i.e., to interpret the amended plan as not requiring the payment of default interest), they argue, would violate § 1129(b)'s fair and equitable standard. We agree. Default interest rates are intended to transfer some of the risk of default from creditors to the debtor. By interpreting the plan as allowing interest only at the non-default rate, the bankruptcy court effectively transferred that risk back to the Class 4 creditors. Despite the equitable nature of bankruptcy proceedings, the bankruptcy judge does not have "free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness." *Rather, absent compelling equitable considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights.*

Id. (emphasis added) (citations omitted).

This principle has been applied to obligations arising out of the prepayment of debt.  For example, in UPS Capital Bus. Credit v. Gencarelli (In re Gencarelli), 501 F.3d 1 (1st Cir. 2007), the solvent debtors, whose cases had been consolidated, disputed their obligation to pay prepayment penalties under two commercial loan agreements that they had entered into prior to commencing their bankruptcy cases.  The bankruptcy court found the penalties unreasonable in amount and, therefore, unenforceable in their entirety under § 506(b).  On appeal, the district court affirmed.  In reversing both lower courts, the First Circuit Court of Appeals held that where a debtor is solvent, prepayment penalties are in fact allowable as unsecured claims under § 502(b), obviating the need to satisfy the reasonableness requirement of § 506(b):

> Let us be perfectly clear.  This is a solvent debtor case and, as such, the equities strongly favor holding the debtor to his contractual obligations as long as those obligations are legally enforceable under applicable non-bankruptcy law.  When the debtor is solvent, "the bankruptcy rule is that where there is a *contractual* provision, valid under state law, . . . the bankruptcy court will enforce the contractual provision."

Id. at 7 (citing Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp., 679 F.2d 264, 269 (1st Cir. 1982))(emphasis in original); see Ruskin v. Griffiths, 269 F.2d 827, 832 (2d Cir. 1959), cert. denied, 361 U.S. 947 (1960) (in bankruptcy cases involving solvent debtors, it is "the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act"); see also In re Vanderveer Estate Holdings, Inc., 283 B.R. 122, 131-32, 134 (Bankr. E.D.N.Y. 2002); In re 360 Inns Ltd., 76 B.R. at 575 (the debtor's solvency warranted a distribution under the plan on account of a prepayment premium).

5. **The Debtors' Solvency**

The Debtors insist that whether they were solvent *vel non* is irrelevant because they had no

unfulfilled contractual obligations under the Indenture.  For the reasons previously set forth in this opinion, this argument fails.

The Debtors next insist that they were "equitably" insolvent on the Petition Date and thereafter because they could not pay their debts as they became due.  The Claimants counter that the Debtors were solvent at all relevant times because, simply put, their debts never exceeded their assets, notwithstanding any perceived cash-flow problems.[220]

A wealth of testimony and other evidence regarding the financial status of the Debtors consumed much of the Adversary Trial.  The resolution of the solvency issue largely depends on which test this Court applies.  The Debtors rely upon  the "equitable insolvency" test found in statutes that determine insolvency for purposes of avoiding fraudulent transfers, based, in part, upon whether the debtor "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured."  11 U.S.C. § 548(a)(1)(B)(ii)(III); see also 11 U.S.C. § 303(h)(1) (providing for order of relief in an involuntary case if a debtor "is generally not paying such debtor's debts as such debts become due").  The Claimants, on the other hand, propose an adjusted balance sheet test based on the definition of  "insolvent" set out in § 101(32).  The distinction is important.  A debtor may not be paying his debts as they become due, yet may be solvent under a balance sheet analysis because it has the ability to pay its debts by, for example, liquidating assets.  Conversely, a debtor may be insolvent under a balance sheet analysis but may be paying its debts as they become due.

The Claimants' evidence presented at the Adversary Trial of the Debtors' solvency on a balance

---

[220] The Claimants also dispute the Debtors' factual assertion that they could not pay their debts as they became due, given the source of funding available to them from Leucadia.  Test. of Todd Raziano, Trial Tr. at 614:13-616:24.

sheet basis included the following: (1) the schedules filed by the Debtors in the underlying bankruptcy case showing that the Debtors scheduled $252,862,214.96 in assets and $230,142,366.45 in liabilities (Bankr. Dkt. 106); (2) the "100% percentage recovery" for general unsecured creditors under the Plan, plus post-petition interest at the federal judgment rate, and the shareholders' retention of equity;[221] see Vanderveer, 283 B.R. at 134 (in applying the solvent debtor test, court relied on fact that secured and unsecured creditors under the plan were paid in full with interest, and equity owners retained their interest); and (3) the Debtors' audited financial statements showing that their assets exceeded their liabilities.[222]  In addition to the above, the Claimants offered testimony from Saul Solomon ("Solomon"), who the Court accepted as an expert on valuation and solvency.[223] Solomon concluded that the Debtors were solvent on: September 19, 2006 (the Petition Date); July 30, 2007 (the date of the Confirmation Order); and August 10, 2007 (the date of repayment of the Notes),[224] using the definition for "insolvent" under § 101(32):

> The term "insolvent" means—
>
> (A)  with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . . .

11 U.S.C. § 101(32).  In his formal solvency analysis, Solomon used the asset approach as his

---

[221] Trial Exs. 9 at 19 of 37 & 17 at 20 of 42 & 18 at 17 of 202.  The Plan, however, delayed payment of half of the amount of the unsecured claims for 60 days.

[222] Trial Exs. 132, 194, 84 & 85.

[223] Solomon is a licensed Certified Public Accountant (CPA), Accredited in Business Valuation (ABA), and a Certified Valuation Analyst (CVA) and has testified as an expert witness in numerous federal courts.  See Trial Ex. 165.

[224] Expert Report of Saul Solomon, Trial Ex.165.

valuation methodology.[225]  He then reached his opinion as to the Debtors' solvency, based in large part on his review of the Debtors' bankruptcy schedules and the financial statements that the Debtors provided Leucadia.[226]

The asset approach, as its name suggests, required Solomon to focus on the value of the Debtors' underlying assets.  Using a cost-basis balance sheet prepared in accordance with Generally Accepted Accounting Principles ("GAAP") and dated September 19, 2006, Solomon made two notable adjustments to the value of the property listed therein by the Debtors.  He did so because of the requirement in § 101(32) that the property be shown on the balance sheet "at a fair valuation," which he construed as fair market value premised on the Debtors' "going concern" status.  First, Solomon changed the value of the Hard Rock license from its book value of $472,916, the amount shown in the bankruptcy schedules, to an amount he considered reflected its fair market value, $11,754,000,[227] the same amount that the Debtors had assigned it in their reports to Leucadia in September, 2006.[228]  Second, he included the value of construction in progress as $17,531,000, an amount reported to Leucadia by the Debtors but not shown on the Debtors' cost-basis balance sheet.  As a result of these adjustments, Solomon found that on September 19, 2006, the assets of the Debtors exceeded their

---

[225] Solomon also used the income approach with the same result.  Under that approach, computations generally determine that the value of a business equals its expected future income divided by a required rate of return.  Solomon concluded that the assets of the Debtors exceeded their liabilities by $53,168,016 on September 19, 2006, $57,710,037 on July 30, 2007, and $57,179,335 on August 10, 2007.  Trial Ex. 165, at 22 of 71.

[226] Expert Report of Saul Solomon, Trial Ex.165.

[227] Id. at 49 of 71; see also Trial Ex. 196, Schedule BS-7 (reporting value of Hard Rock license as of December 31, 2006, at $11,748,000).

[228] Leucadia assigned the value of its intangible assets at $11.9 million in its annual report to the SEC for the fiscal year ending December 31, 2006. Trial Ex. 183, at 67 of 102.

liabilities by approximately $50,048,371.  Solomon used a cost-basis balance sheet of August 9, 2007, to conclude that at that time, the Debtors' assets exceeded their liabilities by $28,151,457.

Other evidence of the Debtors' solvency relied upon by Solomon was the purchase by Leucadia in April, 2006, of a controlling interest in the Debtors at a price of $89 million.  Also, the Debtors' ability to obtain exit financing from Leucadia in order to consummate the Plan, according to Solomon, constituted anecdotal evidence of solvency as of August 10, 2007.

The Debtors, eschewing the balance sheet test, maintain that as of the Petition Date, they only had approximately $200,000 in usable cash but were in debt approximately $20 million, not including the $160 million they owed the Noteholders.[229]   The Disbursement Agent held the Insurance Proceeds in a wholly restricted bank account[230] to which the Debtors had no access.  To show they were in dire straits, the Debtors point out that some of their trade vendors had filed lawsuits and liens on property of the Resort due to lack of payment.[231]  Had three or more of the Debtors' unsecured creditors chosen to file an involuntary petition against the Debtors under § 303, the Debtors could not have controverted it.  See 11 U.S.C. § 303(h)(1) (providing as a basis for order of relief in involuntary case that "debtor is generally not paying … [its] … debts as such debts become due . . . .").

The Debtors did not present testimony at the Adversary Trial of a solvency expert but relied on the testimony of Raziano to dispute Solomon's finding of solvency.  Raziano prepared his own

---

[229] See Test. of Saul Solomon at Trial Tr. 363:4–7, 13–17; Test. of Todd Raziano at Trial Tr. 480:5–16.

[230] See Test. of Joseph Billhimer, Cash Collateral Hr'g (Oct. 3, 2006), Trial Ex. 29, at Hr'g Tr. 207:5, 210:20–21.

[231] See Trial Ex. 60; Test. of Todd Raziano, Trial Tr. 481:22–482:13.

balance sheet and challenged Solomon's figures by urging two downward departures. First, he sought to include the book value, rather than the market value, of the Hard Rock license. However, Leucadia's own securities filings, which were based upon information supplied by the Debtors, showed that the market value of the license was $11.9 million as of December 31, 2006.[232] Second, Raziano proposed to exclude the $11 million value of the insurance receivable owed by James River Insurance Co., although the financial statements of Premier Finance included that asset as of August 9, 2007.[233]

This Court finds that the appropriate solvency test under these facts is the adjusted balance sheet test, which is the test used by Solomon and which, more importantly, is the traditional bankruptcy test of insolvency. See H.R. No. 100-11, 100th Cong. 2d Sess. 5-6 (1988). The Debtors' argument that this Court should adopt an equitably insolvency test that applies under the Bankruptcy Code only in limited factual circumstances is unconvincing and appears to have been based on its outcome rather than on its appropriateness. In that regard, the Debtors have not cited any case that has applied the equitably insolvency test for the purpose offered here, and the Court has not found one. In applying the adjusted balance sheet test, this Court finds that the solvency of the Debtors at all relevant times was established to this Court's satisfaction by Solomon's expert testimony and other documentary evidence presented by the Claimants. The Debtors' liabilities clearly did not exceed their assets when those assets were valued according to their fair market price.

Because Claimants have shown that the Debtors were solvent, the Claimants are entitled to

---

[232] Trial Exs.183, at 67 of 102, & 196, Schedule BS-7.

[233] Trial Ex.150, at 4 of 28. Raziano explained that including the claim against James River Insurance Co. would violate the GAAP. Test. of Todd Raziano, Trial Tr. 582:9-20.

pursue an unsecured claim for damages under § 502 for the Debtors' breach of the Indenture.  See
United States v. Winstar Corp., 518 U.S. 839, 885 (1996) (holding that damages are always the
default remedy for breach of contract unless the parties agree otherwise); In re 360 Inns Ltd., 76
B.R. at 576;  In re Lappin Elec., 245 B.R. at 330 ("this court is in agreement with a majority of
courts that view a prepayment charge as liquidated damages, not as unmatured . . . interest that
would be disallowed under section 502(b)(2)").  The issue then becomes the appropriate measure
of damages, to which this Court now turns.

### 6. Damages

In a financing such as the Indenture *sub judice*, a "no-call" provision allocates between the
borrower and the lender the risk associated with future interest rate fluctuations and provides an
essential protection to the noteholder.  As explained in the Commentaries on Model Debenture
Indenture Provisions:

> If interest rates rise after the loan is made, the negotiated [interest] rate [in the
> applicable indenture] will be favorable to the borrower and unfavorable to the lender
> and the borrower is not likely to seek to pay the debt prior to maturity–he will enjoy
> the benefits of his bargain. Conversely, if interest rates fall and the negotiated rate
> proves unfavorable to the borrower and favorable to the lender, the borrower will
> naturally refinance the debt if he can. Unless the lender puts some restrictions on the
> privilege to repay before maturity, he will tend to be left with low interest rate loans
> until their maturity and have all the high interest rate loans prepaid.

American Bar Foundation Corporate Debt Financing Project, Commentaries on Model Debenture
Indenture Provisions 475 (1971).  Based on the testimony offered at the Adversary Trial by the
Claimants' damages expert, Christopher Kearns ("Kearns"), there is no dispute that, as a result of
the prepayment of the Notes that occurred under the Plan, the Claimants were deprived of the
present value of an expected payment stream under their Notes.  Moreover, Kearns provided
uncontroverted testimony that even assuming the Noteholders were able to reinvest the principal

immediately, the market rate of yields on investments for comparable debt instruments was considerably less than the contract rate under the Indenture. Both Kearns and David Behenna, a financial consultant for PIMCO, further explained that, while one can calculate the spread between contract and market rates on comparable paper on a present value basis, it is difficult to quantify damages resulting from the delay and cost in finding alternative investments with comparable risk in which to reinvest the proceeds and the risks of having to a make second investment decision.[234] Because of this difficulty, the Claimants presented to this Court at the Adversary Trial three alternative approaches for determining the amount of their unsecured claim.[235]

### a. $12,834,827—the Defeasance Clause

First, the Claimants contend that the defeasance clause provides the appropriate basis for awarding damages in the amount of $12,834,827. That amount is what § 12.01 required the Debtors to pay if they had chosen to be relieved from the obligations and covenants contained in the Indenture during the No-Call Period. Approaching damages in this way, according to the Claimants, gives effect to the benefit of the bargain struck by the parties to the Indenture. Indeed, the Claimants describe § 12.01 of the Indenture as an "alternative performance clause." See Carlyle Apartments Joint Venture v. AIG Life Ins. Co., 635 A.2d 366, 372 (1994) (finding prepayment provision to be alternative performance clause rather than liquidated damages clause). Under that provision, the Debtors could have chosen to deposit with the Indenture Trustee cash or noncallable government

---

[234] Test. of David Behenna, Trial Tr. at 128:3-12; Test. of Christopher Kearns, Trial Tr. at 259:18-260:10.

[235] The Claimants also contend that this Court should award them $10,750,000, the amount of liquidated damages due under § 6.02 of the Indenture. However, this Court has already found § 6.02 inapplicable. See supra subsection C.

securities "in such amounts as will be sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Notes not delivered to the Trustee for cancellation for principal, premium and Liquidated Damages, if any, and accrued interest to the date of maturity or redemption."[236]

The Debtors contend, and this Court agrees, that defeasance under § 12.02 is inapplicable for two reasons. First, defeasance is a borrower's remedy, not a lender's defense, a matter which the Claimants admitted at the Adversary Trial.[237] See Solutia, 379 B.R. at 488 ("Defeasance is a feature designed to protect borrowers, not lenders."); see generally John C. Murray, Defeasance Provisions in Securitized-Loan Documents, 498 PLI Real Est. L. 203, 211 (Oct. 2003); George Lefcoe, Yield Maintenance and Defeasance: Two Distinct Paths to Commercial Mortgage Prepayment, 28 Real Est. L.J. 202, 205 (Winter 2000). Outside of the bankruptcy context, defeasance generally allows a borrower "to take advantage of rising interest rates and avoid prepayment premiums or make its balance sheet more attractive." CalGen, 365 B.R. at 399 (footnote omitted). Clearly, § 12.01 of the Indenture was not intended to benefit the Claimants.

Second, §12.01(2) required as a condition precedent to any defeasance that "no Default or Event of Default has occurred . . . ." Thus, in order for the Debtors to have defeased the Notes, an event of default could not have existed. Am. Answer and Countercl. ¶ 22 (Adv. Pro. Dkt. 51); see CalGen, 365 B.R. at 399 (defeasance provision inapplicable because it provided that the debt could not be defeased if an event of default occurred and was continuing); Solutia, 379 B.R. at 488 (holding the defeasance clause was irrelevant since the debtors were not seeking to effect defeasance). Clearly,

---

[236] Indenture § 12.01, at 103-104 of 113, Trial Ex. 1.

[237] Test. of Christopher Kearns, Trial Tr. 267:20-25.

the Claimants asserted that events of default occurred both pre-petition and post-petition. See Indenture § 6.01(o); Amended Answer and Countercl. ¶¶ 28, 31 (Adv. Pro. Dkt. 51).

The Claimants contend that the Debtors could have sought a cure or waiver of the events of default in the Plan pursuant to § 1123(a)(5). Indeed, Sylvester testified at the confirmation hearing that the Noteholders would have agreed to waive any event of default if the Debtors had elected to defease the Notes.[238] The Claimants, however, have not pointed to a single bankruptcy case in which the defeasance provisions of an Indenture were given such effect.

In short, this Court concludes that applying defeasance in this case would run counter to both the plain meaning of the Indenture and to the fundamental tenets of defeasance itself. Given these circumstances, it is inappropriate for this Court to measure damages based upon the amount of the payment that the Claimants would have received if Debtors had exercised their right to defease, an amount that equals $12,834,827.[239]

### b. $9,574,123—Actual Loss

The second approach for the measure of damages urged by the Claimants is not based upon any specific provision in the Indenture but, rather, upon the present value difference between the market interest rate and the contract interest rate of 10.75% at the time the Notes were repaid. Kearns testified at the Adversary Trial that, as of August 2007, the market yield on investments comparable to the Notes–secured debt issued by gaming companies with profiles comparable to the

---

[238] Test. of Steven Sylvester, Confirmation Hr'g (June 22, 2007), Trial Ex. 37, H'rg Tr. at 101:8-102:9.

[239] Trial Ex. 175.

Debtors[240]–was 8.94%.  Based on that yield, the amount of actual damages as of August 10, 2007, totaled about \$10,478,960,[241] when calculated through the original date of maturity. However, this amount does not take into account that if the yield on comparable loans in the market fell below 9.2573% (a 1.5% reduction from the contract rate of 10.75%), the Debtors would have refinanced the Notes and paid the optional redemption price on February 1, 2008.[242]  Redemption of the Notes on February 1, 2008, reduces the Claimants' damages to \$9,574,123.[243]  The Debtors offered no evidence to contradict Kearns' opinion regarding the yield for comparable investments in the market place or his calculation of actual damages.

The Court finds that this second approach best approximates the Claimants' actual damages, taking into account that the Debtors would have exercised their option under § 3.07(b) of the Indenture to redeem the Notes on February 1, 2008, to reduce their debt costs. The Indenture expressly provides "[a]ll remedies are cumulative to the extent permitted by law,"[244] thereby authorizing the Claimants to recover their actual damages for breach of the Indenture, as dictated by New York law.  In a series of cases, the federal district court in New York employed a similar approach in determining actual damages for breach of an agreement to borrow money by measuring the present value of the difference, through the duration of the loan, between (1) the interest income

---

[240] Kearns identified comparable investments by the following criteria: (1) secured debt; (2) of approximately \$160 million; (3) with a maturity date similar to 2012; (4) issued by a single-site operator; and (5) with a debt rating of single B to triple Cs.  Test. of Christopher Kearns, Trial Tr. 244:10-245:2.

[241] Trial Ex. 178, at 7 of 8.

[242] Trial Ex. 178, at 8 of 8.

[243] Compare Trial Ex. 178, at 3 of 8 with Trial Ex. 178, at 7 of 8.

[244] Indenture § 6.03, at 10 of 113, Trial Ex. 1.

the lender would have earned under the contract through maturity and (2) the interest income that

the lender could have earned by making an investment comparable to the loan.  See, e.g., Teachers

Ins. & Annuity Ass'n of Am. v. Coaxial Communs. of Cent. Ohio, 799 F. Supp. 16, 19 (S.D.N.Y.

1992); Teachers Ins. & Annuity Ass'n of Am. v. Ormesa Goethermal , 791 F. Supp. 401, 415-17

(S.D.N.Y. 1991); Teachers Ins. & Annuity Ass'n of Am. v. Butler, 626 F. Supp. 1229 (S.D.N.Y.

1986).   Notably, other bankruptcy courts have used this same formula in determining the validity

of prepayment charges under state liquidated damages laws.  See Outdoor Sports, 161 B.R. at 424;

Imperial Coronado, 96 B.R. at 1001; In re Duralite Truck Body & Container Corp., 153 B.R. 708,

714 (Bankr. D. Md. 1993); A.J. Lane & Co., 113 B.R. at 829.

### c. $8.6 Million—the Earliest Redemption Price

The final approach for the measure of damages, which was mentioned at the Adversary Trial

only briefly,[245] would require this Court to adopt the earliest optional redemption price under § 3.07

of the Indenture, $8.6 million, as a proxy for damages.  This is the approach used by the court in

CalGen to calculate damages for prepayment during the no-call period. CalGen, 365 B.R. 399-400.

At best, however, this price reflects an attempt to pre-estimate the Noteholders' probable damages

if the Notes were repaid early on February 1, 2008.  Here, however, the Notes were repaid about one

year before that date, on August 10, 2007.  Thus, this redemption price does not adequately represent

the Noteholders' actual loss of future interest payments, and more importantly, was not intended in

the Indenture to reflect the amount of damages for the breach involved in this matter.  Accordingly,

this Court concludes that the $8.6 million optional redemption premium is not a reasonable

---

[245] Kearns mentioned this final approach for measuring damages only briefly at the end of
his direct examination.  Test. of Christopher Kearns, Trial Tr. at 260:19-261:6.

substitute for the Claimants' actual damages,[246] especially here where the amount is reasonably capable of ascertainment.

### 7. Interest

"In a bankruptcy case, interest is the tail of the dog, but it is a long tail and it wags a lot." Dean Pawlowic, Entitlement to Interest under the Bankruptcy Code, 12 Bankr. Dev. J. 149, 150 (1995). Generally, where a debtor is insolvent, the Bankruptcy Code does not allow payment of post-petition interest on unsecured claims in a chapter 11 case. See Nicholas v. United States, 384 U.S. 678, 685 (1966) ("the accumulation of interest on a debt must be suspended once an enterprise enters a period of bankruptcy administration beyond that in which the underlying interest-bearing obligation was incurred."); United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs. (In re Timbers of Inwood Forest Assocs.), 793 F.2d 1380, 1385 (5th Cir. 1986) (generally, creditors are not allowed to recover interest that accrues on their debts during the pendency of a bankruptcy case); see 11 U.S.C. § 502(b)(2) (excluding "unmatured" interest from a creditor's allowed claim). There is an exception, however, in those rare instances where a debtor is solvent. See Debentureholders Protective Comm. of Cont'l Inv. Corp., 679 F.2d at 271 ("It is a general rule of federal bankruptcy law that if the alleged bankrupt proves solvent, creditors have a right to receive post-petition interest at the statutory general rate . . . before any surplus reverts to the debtor."). The basis for the exception does not rest on the pre-petition contract between the debtor and its unsecured creditor, but instead rests on § 726, which provides for payment of interest at "the legal rate" prior to the return to the debtor of any surplus that exists after full payment of all claims having a higher priority. 11 U.S.C. § 726(a)(5)-(6). Section 726 applies indirectly to chapter 11 cases by virtue of the "best

---

[246] See Summary of Damages, Trial Ex. 190.

interests of creditors" test in § 1129, under which distributions proposed under a plan of reorganization under chapter 11 must at least equal the amount that would have been paid in a liquidation under chapter 7.  See 11 U.S.C. § § 1129(a)(7), 1225(a)(4), 1325(a); see also In re Schoeneberg, 156 B.R. 963, 972 (Bankr. W.D. Tex. 1993) (applying § 726(a)(5) in context of § 1129(a)(7)).  Absent the solvency of a debtor and application of the "best interests of creditors" test, however, § 502(b) prohibits payment of any unmatured interest to unsecured creditors.

Because the Debtors in this case were solvent, the Court finds that the Claimants are entitled to interest on the amount of the premium owed them by the Debtors.[247]  Dow Corning, 456 F.3d at 678-79 (6th Cir. 2006); In re Carter, 220 B.R. 411, 414–16 (Bankr. D.N.M. 1998). The sole remaining issue is which *rate* of interest this Court should apply: the non-default contract rate of 10.75%, the default contract rate of 11.75%,[248] the state law judgment rate of 9%, N.Y.C.P.L.R. §§ 5001, 5004 (Consol. 2007), or the federal judgment rate, 28 U.S.C. § 1961. Not surprisingly, the Claimants urge this Court to adopt the highest rate of interest, 11.75%, or, in the alternative, 9%.[249]

---

[247] Having reached this finding, it is unnecessary for this Court to decide whether the Debtors' solvency permits, rather than requires, an award of interest.  Compare Groundhog, Inc. v. San Joaquin Estates, Inc.(In re San Joaquin Estates), 64 B.R. 534, 536 (9th Cir. BAP 1986) (lower court abused its discretion in denying post-petition interest where debtor was "very solvent") with Commercial Paper Holders v. Hine (In re Beverly Hills Bancorp.), 752 F.2d 1334, 1339 (9th Cir. 1984) (award of post-petition interest depends upon the equities of the case).

[248] The Notes provided, in pertinent part: "The Issuers will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at a rate that is 1% per annum in excess of the rate then in effect . . . ."  Trial Ex. 4, at 2.

[249] See Trial Ex. 190 (summary of the amount of interest payable on different premium amounts using default contract rate of 11.75% and the state judgment rate of 9%).

### 8.  Rate of Interest

There is a split of authorities regarding the appropriate "legal rate" at which to calculate post-petition interest on unsecured claims in the context of a solvent debtor. Under the first approach, the legal rate is defined under state law and, accordingly, that interest is generally "payable either at the contract rate, at the statutory rate (if a specialized statute establishes a specialized rate of interest for a particular creditor), or, if there is no applicable statute and no rate was contracted for, at the state judgment rate." See Schoeneberg, 156 B.R. at 972. Under the second approach, the legal rate refers to a single uniform rate, the federal judgment rate established by 28 U.S.C. § 1961. See In re Melenyzer, 143 B.R. 829, 832 (Bankr. W.D. Tex. 1992). The problem with the first approach, as explained in Melenyzer, is that under state law different rates of interest could apply to different unsecured creditors, depending on the terms of the pre-petition contracts and on the provisions of the applicable state statutes. Id. Indeed, this case illustrates the problem: Because the Plan defines a "General Unsecured Claim" to include interest at the federal judgment rate as of the Petition Date,[250] an award of interest to the Claimants at a higher rate under state law would result in more favorable treatment of their unsecured claim. Yet, the justification for awarding such interest is to compensate creditors for the procedural delay they experience as a result of the bankruptcy case itself, a delay imposed equally upon *all* of the unsecured creditors. More importantly, the Plan does not specifically provide for payment of a higher rate of interest to the Claimants, and the Claimants did not object to the treatment of the unsecured creditors under the

---

[250] Plan § 1.43.

Plan.[251] See 11 U.S.C. § 1141.

Finally, in balancing the equities of this case, this Court is mindful of the fact that the amount of post-confirmation interest that accumulated on this debt is in large part the result of a delay in the Adversary Trial. Although the Debtors initiated the Adversary on November 8, 2007, it was held in abeyance for over one year because of the Confirmation Appeal prosecuted at the behest of the Claimants. The purpose of § 726(a)(5), in providing for post-petition interest, is "to prevent debtors from abusing the bankruptcy process by using it to delay payments and avoid interest obligations when at the time of filing the petition the debtor was actually solvent." Thompson v. Kentucky Lumber Co. (In re Kentucky Lumber Co.), 860 F.2d 674, 676 (6th Cir. 1988). Awarding the Claimants a default contract rate of interest under these circumstances would not further that purpose. The cases cited by the Claimants in support of their contention that this Court should apply the rate of interest bargained for in the Indenture under state law are inapposite because they involved secured creditors seeking post-petition interest under § 506, whereas this case involves an unsecured creditor seeking post-confirmation interest under § 502 from a solvent debtor. Cf. Southland Corp. v. Toronto-Dominion (In re Southland Corp.), 160 F.3d 1054, 1059 (5th Cir. 1998) (under § 506, oversecured creditor was entitled to default contract rate); 139-141 Owners Corp., 313 B.R. at 367 (oversecured creditors must be afforded contractual rights under § 506); United States Trust Co. v. LTV Steel Co. (In re Chateaugay Corp.), 150 B.R. 529, 539 (Bankr. S.D.N.Y. 1993) (oversecured creditors are entitled to post-petition interest under § 506 pursuant to applicable state law; Vantage Invs., Inc. v. Loc Nguyen Corp. (In re Vantage Invs., Inc.), 385 B.R. 670, 702 (Bankr.

---

[251] Indeed, the Noteholders recognized in the Bankruptcy Court Stay Motion that § 502(b) limited payment of post-petition interest to the unsecured creditors at the federal judgment rate, rather than at the contract rate.

W.D. Mo. 2008) (secured creditor of solvent debtor was entitled to post-petition interest at contract rate under § 506 as "the statutory judgment rate would be applicable only if the contract did not specify a rate of interest").

In short, the Court finds that the federal judgment rate approach, rather than the state law approach, provides the appropriate measure of interest and, therefore, post-confirmation interest on the amount of the premium should be calculated at the federal judgment rate in effect on August 10, 2007. See In re Country Manor of Kenton, Inc., 254 B.R. 179 (Bankr. N.D. Ohio 2000) (legal rate means federal judgment rate, not contract rate); In re Chiapetta, 159 B.R. 152, 160-61 (Bankr. E.D. Pa. 1993) (a § 502 claim is "like a judgment entered at the time of the bankruptcy filing" and interest should be calculated at the federal judgment rate).  The equities of the case favor this result, especially since the Claimants did not object to the application of the federal judgment rate in the Plan.  Finally, applying the federal judgment rate promotes uniformity within bankruptcy law and is consistent with the approach of the United States Supreme Court in its decision in Till v. SCS Credit Corp., 541 U.S. 465 (2004) (in selecting cramdown rates, courts should treat similar creditors similarly).

In summary, this Court finds that the Claimants have established that the Debtors breached the No-Call Provision in § 3.07 of the Indenture and that, therefore, the Noteholders are entitled to an unsecured claim under § 502(b) for damages against the Debtors, who were solvent at all relevant times under the adjusted balance sheet test.  The amount of their damages is the present value difference between the market interest rate and the contract interest rate at the time the Notes were repaid with interest accruing at the federal judgment rate.

**Conclusion**

For the reasons set forth above, this Court concludes that the Noteholders are entitled to an allowed unsecured claim in the amount of $9,574,123, plus interest at the federal judgment rate in effect on August 10, 2007, from that date until paid in full but in no event are entitled to more than the amount in the Disputed Liquidated Damages Escrow. Accordingly, U.S. Bank should distribute the amount of the allowed unsecured claim to the Noteholders solely from the Disputed Liquidated Damages Escrow and should return any amount that remains to the Debtors. The Court further concludes that U.S. Bank should return to the Debtors any amount that remains in the Fee Reserve after final payment of the Indenture Trustee's reasonable fees and expenses, as provided for in the Plan. Finally, those provisions of the Indenture that remained in effect following the effective date of the Plan should be cancelled without further notice or hearing after distribution by U.S. Bank of all the proceeds from both the Disputed Liquidated Damages Escrow and the Fee Reserve.

A separate final judgment will be entered in accordance with Federal Rule of Bankruptcy Procedure 7058.

SO ORDERED.

_Neil P. Olack_
Neil P. Olack
United States Bankruptcy Judge
Dated:  September 3, 2010